DMP:AAS/ICR/NJM/JKW
F. #2023R00138

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

BAI YUNPENG (白云鹏),
CHEN ZHICHEN (陈之琛),
GAO CAINAN (高彩楠),
GAO HONGTING (高宏亭),
HU XIAOHUI (呼啸慧),
HUANG CHUNHUI (黄春晖),
JIN YI (金乙),
JU QIANG (居强),
LI BOLUN (李博伦),
LI XUAN (李轩),
LI XUEYANG (李雪阳),
LI ZHEFENG (李哲峰),
LIANG SHUANG (梁爽),
LIN YUQIONG (林玉琼),
     also known as "Lin Huishan (林慧姗),"
LIU ZHAOXI (刘朝夕),
MIAO SHIHUI (苗世辉),
SHI LIANGTIAN (史粮田),
SONG YANG (I) (宋杨),
SONG YANG (II) (宋阳),
TAN JINYAN (覃金燕),
WANG CHUNJIE (王春杰),
WANG SHIPENG (王士朋),
WEN JIANXUN (温建勋),
XI SHUO (西硕),
XI YUE (袭岳),
     also known as "Qi Dong (齐栋),"
XU YANAN (徐亚楠),
XU ZHEN (徐震),

COMPLAINT AND
AFFIDAVIT IN SUPPORT
OF APPLICATION FOR
ARREST WARRANTS

(T. 18, U.S.C., § 371)

No. 23-MJ-0334 (SJB)

XUE WENFENG (薛文峰),
      also known as "Feng Xu (徐丰),"
YANG DALIN (杨大林),
YANG MIAO (杨淼),
YIN YINA (尹贻娜),
YU MIAO (余苗),
ZHANG DI (张迪) and
ZHOU GUOQIANG (周国强),

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
EASTERN DISTRICT OF NEW YORK, SS:

      JOSEPH HUGDAHL, being duly sworn, deposes and states that he is a

Special Agent with the Federal Bureau of Investigation, duly appointed according to law and

acting as such.

<u>CONSPIRACY TO TRANSMIT INTERSTATE OR FOREIGN THREATS</u>

      In or about and between 2016 and the present, both dates being approximate

and inclusive, within the Eastern District of New York and elsewhere, the defendants BAI

YUNPENG (白云鹏), CHEN ZHICHEN (陈之琛), GAO CAINAN (高彩楠), GAO

HONGTING (高宏亭), HU XIAOHUI (呼啸慧), HUANG CHUNHUI (黄春晖), JIN YI

(金乙), JU QIANG (居强), LI BOLUN (李博伦), LI XUAN (李轩), LI XUEYANG

(李雪阳), LI ZHEFENG (李哲峰), LIANG SHUANG (梁爽), LIN YUQIONG (林玉琼),

also known as "Lin Huishan (林慧姗)," LIU ZHAOXI (刘朝夕), MIAO SHIHUI (苗世辉),

SHI LIANGTIAN (史粮田), SONG YANG (I) (宋杨), SONG YANG (II) (宋阳), TAN

JINYAN (覃金燕), WANG CHUNJIE (王春杰), WANG SHIPENG (王士朋), WEN

JIANXUN (温建勋), XI SHUO (西硕), XI YUE (袭岳), also known as "Qi Dong (齐栋),"

XU YANAN (徐亚楠), XU ZHEN (徐震), XUE WENFENG (薛文峰), also known as "Feng Xu (徐丰)," YANG DALIN (杨大林), YANG MIAO (杨淼), YIN YINA (尹贻娜), YU MIAO (余苗), ZHANG DI (张迪) and ZHOU GUOQIANG (周国强), together with others, did knowingly and willfully conspire to transmit in interstate and foreign commerce one or more communications containing one or more threats to injure the person of another, contrary to Title 18, United States Code, Section 875(c).

(Title 18, United States Code, Section 371)

<u>CONSPIRACY TO COMMIT INTERSTATE HARASSMENT</u>

In or about and between 2016 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants BAI YUNPENG (白云鹏), CHEN ZHICHEN (陈之琛), GAO CAINAN (高彩楠), GAO HONGTING (高宏亭), HU XIAOHUI (呼啸慧), HUANG CHUNHUI (黄春晖), JIN YI (金乙), JU QIANG (居强), LI BOLUN (李博伦), LI XUAN (李轩), LI XUEYANG (李雪阳), LI ZHEFENG (李哲峰), LIANG SHUANG (梁爽), LIN YUQIONG (林玉琼), also known as "Lin Huishan (林慧姗)," LIU ZHAOXI (刘朝夕), MIAO SHIHUI (苗世辉), SHI LIANGTIAN (史粮田), SONG YANG (I) (宋杨), SONG YANG (II) (宋阳), TAN JINYAN (覃金燕), WANG CHUNJIE (王春杰), WANG SHIPENG (王士朋), WEN JIANXUN (温建勋), XI SHUO (西硕), XI YUE (裘岳), also known as "Qi Dong (齐栋)," XU YANAN (徐亚楠), XU ZHEN (徐震), XUE WENFENG (薛文峰), also known as "Feng Xu (徐丰)," YANG DALIN (杨大林), YANG MIAO (杨淼), YIN YINA (尹贻娜), YU MIAO (余苗), ZHANG DI (张迪) and ZHOU GUOQIANG (周国强), together with

others, did knowingly and willfully, and with the intent to harass, intimidate, and place under surveillance with the intent to harass and intimidate one or more persons, conspire to use one or more interactive computer services and electronic communication systems of interstate commerce, and one or more other facilities of interstate and foreign commerce to engage in a course of conduct that caused, attempted to cause and would be reasonably expected to cause substantial emotional distress to one or more persons and their immediate family members, contrary to Title 18, United States Code, Section 2261A(2)(B).

(Title 18, United States Code, Section 371)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.      I have been employed as a Special Agent by the Federal Bureau of Investigation ("FBI") for over ten years.    During my tenure with the FBI, I have participated in numerous investigations, during the course of which I have, among other things: (a) conducted physical and electronic surveillance, (b) executed search warrants, (c) reviewed and analyzed recorded conversations and records, and (d) debriefed cooperating witnesses.    I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file; and from reports of other law enforcement officers involved in the investigation.

2.      The statements attributed to individuals in this Affidavit are set forth in sum, substance and in part unless otherwise indicated.    Unless otherwise indicated, all

---

[1]      Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

quoted communications described herein are draft translations of written Chinese or spoken Mandarin-Chinese. I have personally reviewed each of the electronic communications, including emails and chat messages, described in this Affidavit, and participated personally in some of the interviews discussed herein. My knowledge of other interviews is based upon my review of reports and conversations with other law enforcement officers.

I.    The PRC Government's Online Activities

    A.    Suppression of Political Dissent and Religious Speech and Dissemination of Propaganda

    3.    The People's Republic of China ("PRC") is a one-party state whose government is entirely controlled by the Chinese Communist Party ("CCP").[2]   While the constitution and laws of the PRC government purport to guarantee PRC citizens the freedom of speech, the CCP regards any political dissent as a threat not only to its own political interests, but also to the PRC's one-party system of government itself.   Thus, the PRC government's national security and law enforcement agencies regard political dissent as a national security threat and routinely monitor and actively censor political speech inconsistent with CCP-approved political viewpoints, as well as speech that threatens to damage the reputation of the PRC government or the CCP, or threatens to undermine the PRC's CCP-dominated social order.

    4.    The CCP's "unapproved" topics can range from discussions about the overthrow of the CCP's control of the PRC government and the statuses of the Hong Kong Special Administrative Region and the Republic of China—commonly referred to as

---

[2]    The information set forth in this section is based on my review of publicly available information and my experience investigating numerous cases involving the PRC.

Taiwan—to remarks on CCP General Secretary Xi Jinping's apparent resemblance to the fictional cartoon character Winnie the Pooh. The modern "Five Poisons" of the CCP—typically associated with Uighurs, Tibetans, adherents of Falun Gong spiritual practice, pro-democracy dissidents, and advocates for the independence of the Taiwan—are especially sensitive topics to the CCP.

5. The June 4, 1989, Tiananmen Square massacre is another politically sensitive topic of discussion that is routinely censored by the PRC government. On the night of June 3, 1989, and into the morning of June 4, 1989, following weeks of large student-led protests advocating political and other reforms in the PRC's CCP-controlled system of governance, the People's Liberation Army ("PLA") violently crushed the protesters at Tiananmen Square and surrounding areas in Beijing, PRC during a state of martial law. The PLA's crackdown led to the deaths of hundreds of PRC citizens and was widely condemned as a massacre.

6. The PRC government also prohibits unauthorized religious activities, including online religious discussions. The PRC government requires religious groups to register with government authorities and restricts religious activities by both registered and unregistered religious groups. Collective or large-scale religious activities held outside of registered religious facilities, for example, are strictly restricted, and religious activities by unauthorized religious groups are likewise prohibited. The PRC government imposes criminal penalties on religious groups it deems to be "cults" and uses these laws to persecute

and suppress the free exercise of religious expression by members of religious groups opposed by the CCP.

7.    A primary focus of the PRC government's censorship scheme is the control of information that is available to PRC nationals within the PRC.    With the advent of the digital age, the PRC government built a system of controls informally known as the "Great Firewall of China" (the "GFW").    Operated and enforced primarily by the Cyberspace Administration of China and the PRC's Ministry of Public Security ("MPS"), the GFW has the capability to block Internet access within the PRC to particular servers and applications and is used to monitor and prevent PRC citizens from accessing Internet platforms and services that might allow for the dissemination and discussion of information that runs afoul of messaging approved by the PRC government and the CCP.

8.    The PRC government's efforts to censor political dissent do not end at the PRC's national borders.    Indeed, the PRC government and the CCP have identified the unchecked use of foreign social media sites beyond the jurisdiction of the GFW as a threat because of content that portrays the PRC and the CCP negatively.    Although the MPS is generally identified as the PRC's primary domestic law enforcement agency—responsible for public safety, general criminal investigation, national security and Internet security—its mission extends beyond law enforcement and into functions more associated with an intelligence service.    The MPS routinely monitors, among others, Chinese political dissidents who live in the United States and in other locations outside the PRC.    The MPS regularly uses cooperative contacts both inside the PRC and around the world to influence, threaten and coerce political dissidents abroad.    Indeed, I am aware that the PRC

government has threatened and coerced Chinese political dissidents living in the United States in an effort to silence them.

9. Recommendations in an MPS proposal from March 2020 obtained in the investigation reflect the broad reach of the PRC government's censorship efforts. Noting that most foreign reports about the PRC are negative (which purportedly reflects backlash against the PRC's global ascent), and that Twitter content accounts for approximately 80 percent of the attacks on the PRC and the CCP, the proposal recommends instituting countermeasures to monitor dissent on foreign social media platforms, including Twitter. The proposal's main goal is the construction of an Internet data mining system to monitor for Chinese-language Twitter users who make political comments, to promptly survey their activities, and uncover and track the identities of related individuals and covert political organizations and groups through a database of email and telephone identifiers. Notably, the proposal recommends collecting and categorizing relevant political posts, as well as conducting real-time monitoring of overseas Chinese-language account data to promptly discover political tweets and major public opinion events.

10. The PRC government also engages in active measures to shape public perception, both domestically and abroad, through broad dissemination of propaganda and narratives favored by the PRC government via official state social media accounts, as well as anonymized fake accounts that often appear to belong to users located outside of the PRC.

B. The MPS's "912 Special Project Working Group"

11. The government's investigation has revealed that the MPS carries out these objectives in part through an initiative of the MPS that is referred to internally as the "912 Special Project Working Group" (the "Group"), which has previously been referred to

by the MPS as the "Cyber Investigation Team," based out of the Beijing Municipal Public Security Bureau at a facility in Beijing's Dongcheng District.    As explained below, the Group is part of the "Command Group" of a larger "912 Project" that extends beyond just the MPS in Beijing.    The MPS's broader 912 Project includes MPS officers from several other provinces in the PRC working in the "Command Group," "Comprehensive Material Group," and "Assessment Group."

     a.   <u>The Group's Mission</u>

     12.    As more fully detailed below, the investigation has revealed that the Group has created and used a host of accounts under false names on U.S. social media platforms to disseminate and amplify messages as part of a broad effort to influence and shape public perceptions of the PRC government, the CCP and its leaders in the United States and around the world.    The Group uses its misattributed social media accounts to accomplish this mission both by disseminating and amplifying messages that promote what the PRC government and CCP perceive to be favorable attributes of the PRC's CCP-dominated political system, and by seeking to undermine and discredit the systems and policies of perceived adversaries (including the United States government), democracy, and open societies generally.    Through the anonymized fake accounts controlled by the Group, the MPS has promoted messages to users in democratic countries suggesting that democracy is less efficient and leads to more inequality than does the PRC's CCP-dominated political system.    The anonymized accounts also frequently create and amplify messages with the

purpose of aggravating political and social tensions in democratic countries to undermine the domestic governance of the PRC's perceived foreign adversaries.

13.     As part of the investigation, the government has obtained numerous examples of taskings from the Group's leadership to its officers controlling the Group's misattributed social media accounts which illustrate the Group's mission and the means by which the Group carries it out.    For example:

- In or about August 2021, the 912 Project received a tasking to "work on the investigation report submitted by the U.S. intelligence agencies on the 24[th] [of August] to Biden on the origin of COVID" and the letter submitted by the PRC government to the World Health Organization "emphasizing if relevant parties insist in not ruling out the belief of the laboratory leaks, then it is reasonable to conduct investigations at Fort Detrick and the University of North Carolina based on the principles of fairness and impartiality and have in-depth analysis to strengthen the guidance of public opinion." Group-controlled accounts carried out this tasking and parroted its talking points over an extended period of time, with one post made nearly a year later, for example, "call[ing] on the World Health Organization to strictly investigate the virus laboratories in the United States," and claiming in an accompanying video that the U.S. government had not responded to concerns from the international community on the "highly suspicious concerns at Fort Detrick and the University of North Carolina."    As detailed below, the Group's execution of this tasking also included harassing specific U.S. persons.

- In or about August 2021, the 912 Project received a tasking to "expose and criticize the United States for wasting their effort to provoke conflicts in the South China Sea in order to drive a wedge between China, Vietnam and Singapore; and to ridicule the United States' retreat from Afghanistan having a major impact on its international reputation.    As a responsible country, China has the responsibility to maintain peace, stability and development in the region and the world."

- In or about May 2022, the 912 Project received a tasking to "take advantage of the second anniversary of the [George] 'Floyd's death' incident in the United States to reveal the law enforcement brutality in the U.S., racial discrimination and other social problems." Subsequently, an account controlled by the Group made numerous

posts about George Floyd's death and accusing U.S. law enforcement institutions of racism.

- In or about May 2022, the 912 Project received a tasking to "disclose and criticize the strengthening allied cooperation between the United States and the European Union and pressure put on Russia that has exacerbated the tense Russia-Ukraine conflict." Accounts controlled by the Group subsequently made numerous posts on this topic, one alleging, for example, that protests on the streets of Paris in response to "inflation and high prices" were "the result of the France and Germany cooperating with the US sanctions against Russia" and suggesting that the protesters should protest the United States. Another post argued that the "provocation of the Russia-Ukraine conflict," was part of the United States' "long history of harvesting wealth around the globe by creating conflicts and provoking wars." Other posts by Group accounts amplified public messaging by official Russian government spokespersons suggesting that U.S. intelligence agencies had caused the Nord Stream pipeline explosion.

- In or about July 2022, the 912 Project received a tasking stating, "July 4th, U.S. Independence Day, uncovers its departure from the 'Declaration of Independence,' racial discrimination, pandemic, social division and other issues." Similarly, also in or about July 2022, the 912 Project received a tasking to "work on 2022 US midterm elections and criticize American democracy." Group accounts subsequently continued to spread anti-democratic narratives, targeting both major U.S. political parties, through the 2022 midterm elections. In numerous posts, Group accounts emphasized the divisions and conflict between the two major U.S. political parties, argued that elected leaders are corrupt opportunists that expose the "hypocrisy" of American democracy, and questioned who actually had the interests of the voters at heart.

14.     Finally, and as discussed in more detail herein, in service of the Group's broader mission to manipulate public perceptions of the PRC, the Group uses its misattributed social media accounts to threaten, harass and intimidate specific victims, located in the United States and elsewhere, that the PRC government and the CCP perceive as critical of the PRC government, the CCP and its leaders, and the policies of the PRC government. Through this campaign of threats, harassment and intimidation, the Group

seeks to undermine the credibility of these critics, promote the PRC government's preferred narratives and messaging, and deter these and other critics from continuing to criticize the PRC government and the CCP.

        b.   The Group's Composition and Structure

        15.    The Group is a task force led by and comprised primarily of officers from the MPS's First, Fifth and Eleventh Bureaus.    Images 1 and 2 below depict a secret-level two-page MPS document obtained in the investigation that establishes the Group's primary facility in Beijing's Dongcheng District.    The First Bureau—colloquially known as the Domestic/National Security Police or "*guo bao*," and more recently as the Political Security Protection Bureau or "*zheng bao*"—is the PRC's secret police, with a mandate that includes the suppression and censorship of political dissent, criticism and other potential threats to the PRC government and CCP.    The Fifth Bureau is the MPS's Criminal Investigations Bureau, while the Eleventh Bureau, colloquially known as "*wang an*," is the MPS's Network/Internet Security Bureau.

**Image 1**                                  **Image 2**



16.     The defendants are officers of the MPS's Beijing Municipal Public Security Bureau, who are—or have been—assigned to the Group.    Rosters and duty schedules obtained through the investigation reflect Group membership of approximately 30 to 45 MPS officers at a time in the Beijing Municipal Public Security Bureau; however, as discussed below, the investigation has identified numerous other MPS officers assigned to the broader "912 Project" who are based in branch offices of the MPS located in other major cities in the PRC.    Image 3, which has been redacted to obscure the names of uncharged persons and personal identifiable information, depicts a Group telephone roster from approximately June 2019 comprised of 36 MPS officers.    A portion of the Group's June

2019 duty schedule is visible above the telephone roster in Image 3 and select examples of duty schedules are referenced below.[3]

17.     Some First Bureau officers are assigned indefinitely to the Group as their primary assignments.   For example, Image 4, which has been redacted to obscure the face of an uncharged person, depicts a December 2018 photo with several Group leaders assigned indefinitely from the First Bureau, including SONG YANG (I), LI XUAN, LIN YUQIONG, XUE WENFENG, ZHOU GUOQIANG, a Group officer whose identity is known to the government, and YIN YINA, from left to right.

**Image 3**                                    **Image 4**




18.     Other Group officers are seconded from MPS Beijing branches on temporary-duty assignments of varying durations.   Image 5 below, which has been redacted to obscure the names of uncharged persons and personal identifiable information, contains a

---

[3]     In addition to their everyday responsibilities, many of the Group officers are scheduled once every few days for "on-call" duty assignments, which appear to include the continual monitoring and targeting of issues that arise online with content disfavored by the PRC government and the CCP.

notice dated on or about December 1, 2017, detailing the assignment of HU XIAOHUI to the Group effective on or about December 5, 2017.

**Image 5**



19.     The seconded officers bring varying skills and experience to the Group. As examples, Images 6 and 7 below, which have been redacted to obscure personal identifiable information, depict the credentials for the primary assignments of two of the Group's officers as Deputy Chief Staff Member of the Office of Prevention and Handling of Cult Issues First Detachment and Zhongguancun Police Station staff, respectively.    Images 6 and 7 depict the credentials of the defendants GAO HONGTING and LI XUEYANG respectively.

**Image 6**                    **Image 7**



20.     The Group's operations are led by a captain from the First Bureau.

From at least approximately 2016 through December of 2018, ZHOU GUOQIANG was the

Group captain.    Since approximately December 2018, TAN JINYAN has been the Group

captain.    Photos of ZHOU GUOQIANG and TAN JINYAN are shown in Images 8 and 9

below on the left and right, respectively.

**Image 8**          **Image 9**



21.     The document reflected in Images 1 and 2 above includes the Group's

request for office space needed to accommodate up to sixty people and a detailed list of

necessary equipment, with specific mention of the requirement for laptop computers for

"online reconnaissance work" and television sets for special work teleconferences.    The

needed equipment extends beyond office equipment and hardware and also includes beds, bedding, towels and wardrobes, which are necessary to meet the requirements for the Group's "on-duty preparation work." These accommodations allow the Group to carry out continuous, around-the-clock coverage to deal with urgent matters that arise online.

22. The Group's work is carried out in the "Duty Room" at the Group's Dongcheng District location by one of approximately five duty teams. Each of the duty teams typically is comprised of approximately four to ten Group officers, with certain sensitive time periods staffed with more officers. The duty teams are scheduled in rotating shifts of on-call duty assignments. The schedule with the Group's on-call duty assignments is typically published to the Group's officers and posted monthly. Each duty shift is led by a duty team leader, who supervises the duty team's operations and directs its activities. The duty team leaders generally include the Group captain and other experienced First Bureau officers indefinitely assigned to the Group

23. As noted above, the Group is part of the Command Group for the MPS's larger 912 Project. Image 10, which has been redacted to obscure the names of uncharged persons and personal identifiable information, depicts a roster of MPS officers from approximately early 2018 serving as points of contact for 912 Project units in approximately 15 different provinces in the PRC. Among the contacts for the Group in Beijing is JU QIANG. Evidence obtained during the investigation indicates that the 912 Project encompasses nearly every province in the PRC, including the four provincial-level municipalities of Beijing, Chongqing, Shanghai and Tianjin, and appears to be comprised of hundreds of MPS officers. Image 11, which has been redacted to obscure the faces of

uncharged persons, depicts a gathering of 912 Project officers, including JU QIANG and several of the MPS officers listed on the roster in Image 10.

| **Image 10** | **Image 11** |
| --- | --- |

 

## II. The Defendants

24. The defendants include members of the Group leadership assigned from the MPS First Bureau, as well as individuals who have engaged in actions described below targeting PRC dissidents through online harassment and threats. As part of these schemes, and in service of the Group's broader objective to shape public perceptions of the PRC government and of the CCP, these defendants also disseminated related PRC propaganda through social media accounts at U.S.-based Internet service providers. All named defendants are charged with Conspiracy to Transmit Interstate or Foreign Threats and Conspiracy to Commit Interstate Harassment.

25. Defendant BAI YUNPENG (白云鹏) is a 31-year-old male and a citizen of the PRC. BAI YUNPENG is an officer in the MPS's First Bureau, badge number 062381, seconded to the Group from the MPS's Yanqing Branch, Sihai Police Station since

in or about 2017. Based on my review of internal Group communications and documents, BAI YUNPENG created social media accounts, used these accounts to influence perceptions on issues sensitive to the PRC government and to harass dissidents and critics of the CCP, and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

**<u>Photo of BAI YUNPENG</u>**



26.    Defendant CHEN ZHICHEN (陈之琛) is a 26-year-old female and a citizen of the PRC.    CHEN ZHICHEN is an officer in the MPS's First Bureau indefinitely assigned to the Group since at least on or about March 2020.    Based on my review of internal Group communications and documents, CHEN ZHICHEN has acted in the role of a Group team leader—regularly leading shifts of Group officers who posted, monitored and updated content on various social media platforms to influence perceptions on issues sensitive to the PRC government and to target dissidents and critics of the CCP, and has

corresponded with other defendants about the use of Group-controlled accounts for these purposes.

**Photo of CHEN ZHICHEN**



27.     Defendant GAO CAINAN (高彩楠) is a citizen of the PRC.   GAO CAINAN is an MPS officer indefinitely assigned to the Group since at least in or about 2021.   Based on my review of internal Group communications and documents, GAO CAINAN has acted in the role of a Group team leader—regularly leading shifts of Group officers who posted, monitored and updated content on various social media platforms to influence perceptions on issues sensitive to the PRC government and to target dissidents and critics of the CCP— and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

28.     Defendant GAO HONGTING (高宏亭) is a 35-year-old male and a citizen of the PRC.   GAO HONGTING is an officer in the MPS, badge number 035873, seconded to the Group from the MPS's Haidian Branch, Wenquan Police Station, since on or about September 4, 2019.   Based on my review of internal Group communications and documents, GAO HONGTING has created social media accounts, used these accounts to influence perceptions on issues sensitive to the PRC government and to harass dissidents and

critics of the CCP and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

**Photo of GAO HONGTING**



29.     Defendant HU XIAOHUI (呼啸慧) is a 32-year-old male and a citizen of the PRC.   HU XIAOHUI is an officer in the MPS's Fifth Bureau, badge number 041930, seconded to the Group from the MPS's Fengtai Branch, Criminal Investigation Detachment, since on or about December 5, 2017.   Based on my review of internal Group communications and documents, HU XIAOHUI has created social media accounts, used these accounts to influence perceptions on issues sensitive to the PRC government and to harass dissidents and critics of the CCP, and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

**Photo of HU XIAOHUI**



30.     Defendant HUANG CHUNHUI (黄春晖) is a 37-year-old male and a citizen of the PRC.   HUANG CHUNHUI is an officer in the MPS seconded to the Group

from the MPS's Daxing Branch, Beiwei Village Police Station since in or about 2018. Based on my review of internal Group communications and documents, HUANG CHUNHUI has created social media accounts, used these accounts to influence perceptions on issues sensitive to the PRC government and to harass dissidents and critics of the CCP, and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

31.     Defendant JIN YI (金乙) is a 32-year-old female and a citizen of the PRC.    JIN YI is an officer in the MPS seconded to the Group or a related Group function from the MPS's Huairou Branch since in or about 2019.    Based on my review of internal Group communications and documents, JIN YI has used social media accounts and engaged in online activity to influence perceptions on issues sensitive to the PRC government and to harass dissidents and critics of the CCP, and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

**Photo of JIN YI**



32.     Defendant JU QIANG (居强) is a 32-year-old male and a citizen of the PRC.    JU QIANG is an officer in the MPS's First Bureau, badge number 064780, indefinitely assigned to the Group since in or about 2016.    Based on my review of internal Group communications and documents, JU QIANG has acted in the role of a Group team

leader—regularly leading shifts of several Group officers who posted, monitored and updated content on various social media platforms to influence perceptions on issues sensitive to the PRC government and to target dissidents and critics of the CCP— and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.    JU QIANG also created and used multiple social media accounts to influence perceptions of issues sensitive to the PRC government and to harass dissidents and critics of the CCP.

**Photo of JU QIANG**



33.    Defendant LI BOLUN (李博伦) is a 42-year-old male and a citizen of the PRC.    LI BOLUN is an officer in the MPS seconded to the Group from the MPS's Tongzhou Branch, Jiaowangzhuang Police Station since at least in or about 2017.    LI BOLUN has acted in the role of a Group team leader—regularly leading shifts of several Group officers who posted, monitored and updated content on various social media platforms to influence perceptions on issues sensitive to the PRC government and to target dissidents and critics of the CCP— and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

**Photo of LI BOLUN**



34. Defendant LI XUAN (李轩) is a 31-year-old male and a citizen of the PRC.   LI XUAN is an officer in the MPS's First Bureau, badge number 064799, indefinitely assigned to the Group since in or about 2016.   Based on my review of internal Group communications and documents, LI XUAN has acted in the role of a Group team leader—regularly leading shifts of several Group officers who posted, monitored and updated content on various social media platforms to influence perceptions on issues sensitive to the PRC government and to target dissidents and critics of the CCP— and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

**Photo of LI XUAN**



35. Defendant LI XUEYANG (李雪阳) is a 31-year-old male and a citizen of the PRC.   LI XUEYANG is an MPS officer, badge number 037821, seconded to the Group from the MPS's Haidian Branch, Zhongguancun Police Station, since in or about

April 2018.   Based on my review of internal Group communications and documents, LI XUEYANG has used social media accounts and engaged in online activity to influence perceptions on issues sensitive to the PRC government and to harass dissidents and critics of the CCP, and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

**Photo of LI XUEYANG**



36.    Defendant LI ZHEFENG (李哲峰) is a citizen of the PRC.    LI ZHEFENG is an officer in the MPS's First Bureau seconded to the Group from the MPS's Tongzhou Branch, Zhangjiawan Police Station since in or about 2016.    Based on my review of internal Group communications and documents, LI ZHEFENG has acted in the role of a Group team leader—regularly leading shifts of several Group officers who posted, monitored and updated content on various social media platforms to influence perceptions on issues sensitive to the PRC government and to target dissidents and critics of the CCP— and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

37.    Defendant LIANG SHUANG (梁爽) is a 39-year-old male and a citizen of the PRC.   LIANG SHUANG is an officer in the MPS seconded to the Group from the MPS's Shunyi Branch since on or about April 12, 2019.   Based on my review of internal

Group communications and documents, LIANG SHUANG has created social media accounts, used these accounts to influence perceptions on issues sensitive to the PRC government and to harass dissidents and critics of the CCP, and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

38.     Defendant LIN YUQIONG (林玉琼), also known as Lin Huishan (林慧姍), is a 35-year-old female and a citizen of the PRC.    LIN YUQIONG is an officer in the MPS's First Bureau, badge number 064827, indefinitely assigned to the Group since in or around 2016.    Based on my review of internal Group communications and documents, LIN YUQIONG has acted in the role of a Group team leader—regularly leading shifts of several Group officers who posted, monitored and updated content on various social media platforms to influence perceptions on issues sensitive to the PRC government and to target dissidents and critics of the CCP—and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

**Photo of LIN YUQIONG**



39.     Defendant LIU ZHAOXI (刘朝夕) is a 35-year-old male and a citizen of the PRC.    LIU ZHAOXI is an MPS officer seconded to the Group from the MPS's Haidian Branch, Tiancun Police Station, since on or about September 12, 2017.    Based on

my review of internal Group communications and documents, LIU ZHAOXI has created social media accounts, used these accounts to influence perceptions on issues sensitive to the PRC government and to harass dissidents and critics of the CCP, and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

40.     Defendant MIAO SHIHUI (苗世辉) is a 34-year-old male and a citizen of the PRC.   MIAO SHIHUI is an officer in the MPS's First Bureau, badge number 050571, seconded to the Group from the MPS's Changping Branch, Detachment One, since on or about September 12, 2017.   Based on my review of internal Group communications and documents, MIAO SHIHUI has created social media accounts, used these accounts to influence perceptions on issues sensitive to the PRC government and to harass dissidents and critics of the CCP, and has corresponded with other defendants about the use of Group-controlled accounts for these purposes..

**Photo of MIAO SHIHUI**



41.     Defendant SHI LIANGTIAN (史粮田) is a 29-year-old male and a citizen of the PRC.   SHI LIANGTIAN is an officer in the MPS seconded to the Group from the MPS's Xicheng Branch Political Center District, Patrol Detachment, since in or about 2017.   Based on my review of internal Group communications and documents, SHI LIANGTIAN has created social media accounts, used these accounts to influence

perceptions on issues sensitive to the PRC government and to harass dissidents and critics of the CCP, and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

**Photo of SHI LIANGTIAN**



42.     Defendant SONG YANG (I) (宋杨) is a 43-year-old male and a citizen of the PRC.    SONG YANG (I) is an officer in the MPS's First Bureau, badge number 001548, indefinitely assigned to the Group since in or around 2016.    Based on my review of internal Group communications and documents, SONG YANG (I) has acted in the role of a Group team leader—regularly leading shifts of several Group officers who posted, monitored and updated content on various social media platforms to influence perceptions on issues sensitive to the PRC government and to target dissidents and critics of the CCP— and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

**Photo of SONG YANG (I)**



43.     Defendant SONG YANG (II) (宋阳) is citizen of the PRC.     SONG

YANG (II) is an officer in the MPS seconded to the Group from the MPS's Chaoyang

Branch, Criminal Police Detachment since in or about April 2018.     Based on my review of

internal Group communications and documents, SONG YANG (II) has created social media

accounts, used these accounts to influence perceptions on issues sensitive to the PRC

government and to harass dissidents and critics of the CCP, and has corresponded with other

defendants about the use of Group-controlled accounts for these purposes.

44.     Defendant TAN JINYAN (覃金燕) is a 43-year-old female and a

citizen of the PRC.     TAN JINYAN is an officer in the MPS's First Bureau, badge number

001452, indefinitely assigned to the Group as captain since in or about December 2018.

Based on my review of internal Group communications and documents, TAN JINYAN has

also acted in the role of a Group team leader—regularly leading shifts of several Group

officers who posted, monitored and updated content on various social media platforms to

influence perceptions on issues sensitive to the PRC government and to target dissidents and

critics of the CCP—and has corresponded with other defendants about the use of Group-

controlled accounts for these purposes.

**Photo of TAN JINYAN**



45.    Defendant WANG CHUNJIE (王春杰) is a male and a citizen of the
PRC.   WANG CHUNJIE is an officer in the MPS's First Bureau assigned to the Group
since in or about April 2021.   Based on my review of internal Group communications and
documents, WANG CHUNJIE has acted in the role of a Group team leader—regularly
leading shifts of several Group officers who posted, monitored and updated content on
various social media platforms to influence perceptions on issues sensitive to the PRC
government and to target dissidents and critics of the CCP—and has corresponded with other
defendants about the use of Group-controlled accounts for these purposes.

46.    Defendant WANG SHIPENG (王士朋) is a 37-year-old male and a
citizen of the PRC.   WANG SHIPENG is an officer in the MPS indefinitely assigned to the
Group since in or about April 2021.   Based on my review of internal Group
communications and documents, WANG SHIPENG has acted in the role of a Group team
leader—regularly leading shifts of several Group officers who posted, monitored and
updated content on various social media platforms to influence perceptions on issues
sensitive to the PRC government and to target dissidents and critics of the CCP— and has
corresponded with other defendants about the use of Group-controlled accounts for these
purposes.

47.     Defendant WEN JIANXUN (温建勋) is a male and a citizen of the PRC.   WEN JIANXUN is an officer in the MPS seconded to the Group from the MPS's Fangshan Branch, Detachment One, since in or about 2019.    Based on my review of internal Group communications and documents, WEN JIANXUN has used social media accounts and engaged in online activity to influence perceptions on issues sensitive to the PRC government and to harass dissidents and critics of the CCP, and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

48.     Defendant XI SHUO (西硕) is a 34-year-old male and a citizen of the PRC.   XI SHUO is an officer in the MPS's First Bureau, badge number 032773, seconded to the Group from the MPS's Chaoyang Branch, Olympics Village Police Station, since on or about December 5, 2017.    Based on my review of internal Group communications and documents, XI SHUO has created social media accounts, used these accounts to influence perceptions on issues sensitive to the PRC government and to harass dissidents and critics of the CCP, and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

**Photo of XI SHUO**



49.     Defendant XI YUE (裘岳), also known as Qi Dong (齐栋), is a 36-year-old male and a citizen of the PRC.    XI YUE is an officer with the MPS's First Bureau,

badge number 001830, indefinitely assigned to the Group since in or around 2016.    Based on my review of internal Group communications and documents, XI YUE has acted in the role of a Group team leader—regularly leading shifts of several Group officers who posted, monitored and updated content on various social media platforms to influence perceptions on issues sensitive to the PRC government and to target dissidents and critics of the CCP— and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

**Photo of XI YUE**



50.    Defendant XU YANAN (徐亚楠) is a citizen of the PRC believed to be a 32- or 33-year-old male.    XU YANAN is an MPS officer, badge number 043165, seconded to the Group from the MPS's Fengtai District, Network Security Detachment, since in or about May 2018.    Based on my review of internal Group communications and documents, XU YANAN has created social media accounts, used these accounts to influence perceptions on issues sensitive to the PRC government and to harass dissidents and critics of the CCP, and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

**Photo of XU YANAN**



51.     Defendant XU ZHEN (徐震) is a 29-year-old male and a citizen of the

PRC.   XU ZHEN is an MPS officer seconded to the Group from the MPS's Shijingshan

Branch, Babaoshan Police Station, since on or about December 5, 2017.    Based on my

review of internal Group communications and documents, XU ZHEN has created social

media accounts, used these accounts to influence perceptions on issues sensitive to the PRC

government and to harass dissidents and critics of the CCP, and has corresponded with other

defendants about the use of Group-controlled accounts for these purposes.

**Photo of XU ZHEN**



52.     Defendant XUE WENFENG (薛文峰), also known as Feng Xu (徐丰),

is a 41-year-old male and a citizen of the PRC.    XUE WENFENG is an officer in the MPS's

First Bureau, badge number 001603, indefinitely assigned to the Group since in or about

2016.    Based on my review of internal Group communications and documents, XUE

WENFENG has acted in the role of a Group team leader—regularly leading shifts of several

Group officers who posted, monitored and updated content on various social media platforms to influence perceptions on issues sensitive to the PRC government and to target dissidents and critics of the CCP— and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

**Photo of XUE WENFENG**



53.     Defendant YANG DALIN (杨大林) is a 34-year-old male and a citizen of the PRC.    YANG DALIN is an officer in the MPS seconded to the Group from the MPS's Changping Branch, Detachment One, since on or about December 5, 2017.    Based on my review of internal Group communications and documents, YANG DALIN has acted in the role of a Group team leader—regularly leading shifts of several Group officers who posted, monitored and updated content on various social media platforms to influence perceptions on issues sensitive to the PRC government and to target dissidents and critics of the CCP—and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

54.     Defendant YANG MIAO (杨淼) is a citizen of the PRC believed to be a 30- or 31-year-old male.    YANG MIAO is an officer in the MPS's First Bureau seconded to the Group from the MPS's Shijingshan Branch since in or about 2019.    Based on my review of internal Group communications and documents, YANG MIAO has created social

media accounts, used these accounts to influence perceptions on issues sensitive to the PRC government and to harass dissidents and critics of the CCP, and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

55.     Defendant YIN YINA (尹贻娜) is a 33-year-old female and a citizen of the PRC.   YIN YINA is an officer with the MPS's First Bureau, badge number 064819, indefinitely assigned to the Group since in or about 2016.    Based on my review of internal Group communications and documents, YIN YINA has acted in the role of a Group team leader—regularly leading shifts of several Group officers who posted, monitored and updated content on various social media platforms to influence perceptions on issues sensitive to the PRC government and to target dissidents and critics of the CCP—and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

**Photo of YIN YINA**



56.     Defendant YU MIAO (余苗) is a citizen of the PRC and believed to be a 38- or 39-year-old male.    YU MIAO is an officer in the MPS seconded to the Group from the MPS's Haidian Branch, Network Security Detachment, since in or about 2018.    Based on my review of internal Group communications and documents, YU MIAO has used social media accounts and engaged in online activity to influence perceptions on issues sensitive to

the PRC government and to harass dissidents and critics of the CCP, and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

57.     Defendant ZHANG DI (张迪) is a citizen of the PRC.   ZHANG DI is an officer in the MPS seconded to the Group from the MPS's Changping Branch, Dongxiaokou Police Station, since in or about 2018.   Based on my review of internal Group communications and documents, ZHANG DI has created social media accounts, used these accounts to influence perceptions on issues sensitive to the PRC government and to harass dissidents and critics of the CCP, and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

58.     Defendant ZHOU GUOQIANG (周国强) is a 52-year-old male and a citizen of the PRC.   ZHOU GUOQIANG is an officer in the MPS's First Bureau, badge number 001749, assigned to the Group as captain from in or about at least 2015 through approximately December 2018.   Based on my review of internal Group communications and documents, ZHOU GUOQIANG has also acted in the role of a Group team leader— regularly leading shifts of several Group officers who posted, monitored and updated content on various social media platforms to influence perceptions on issues sensitive to the PRC government and to target dissidents and critics of the CCP—and has corresponded with other defendants about the use of Group-controlled accounts for these purposes.

**Photo of ZHOU GUOQIANG**



III.  Summary of the Means and Methods Used to Carry Out the Criminal Scheme

59.  As discussed above, a primary purpose of the Group is to manipulate and influence public perceptions of the PRC government, the CCP and its leaders, and to undermine and discredit the systems and policies of perceived adversaries, including the United States government, democracy, and open societies generally.  To carry out this mission, the Group conducts online perception management campaigns that promote the propaganda and approved narratives of the PRC government and the CCP on various social media platforms, while attempting to intimidate and silence their critics by discrediting their speech or overwhelming it with counternarratives.

60.  Members of the Group engage in various forms of transnational repression on behalf of the PRC government and the CCP.  Specifically, the Group works to extend the reach of the PRC government's authoritarian policies and practices beyond its national borders by silencing, harassing and threatening dissidents and activists living abroad in the United States and other countries.  As detailed below, the Group has specifically targeted individuals located in the United States for exercising their First Amendment-protected rights to express their views on matters that challenge the narratives approved by the PRC government and the CCP.  The Group has, for example, caused an Internet service

provider headquartered in the United States to terminate meetings and accounts associated with critics of the PRC government, including meetings and accounts of U.S.-based users.

61.     Internal documents and communications among Group members demonstrate that the Group's own officers perceive their work as an effort to defeat the PRC's adversaries.   Image 12 depicts a meme circulated internally by several Group officers characterizing the Group's work as a way of fighting for the PRC government.

**Image 12**



62.     Often in conjunction with their efforts to perpetrate the online harassment campaign, the defendants and other Group members use U.S.-based social media accounts to disseminate propaganda and narratives that mirror and amplify the PRC government's and the CCP's approved public messaging.   This content—often featuring claims that appear to sow discord and distort facts about issues and persons in the United States and elsewhere—is meant to appear as if generated organically by users unaffiliated

with the PRC government and the CCP, many of whom are purportedly located in the United States.

63.     The social media accounts controlled by the Group often purport to belong to authentic individual users, and unlike the official social media accounts of PRC government agencies and officials, conceal from social media services and U.S. users that their content is posted on behalf of the PRC government.     As described herein, some of these social media accounts are created to give the appearance that they are controlled by U.S.-based users, and, in certain instances, communicate directly with U.S. users about subjects of interest to the PRC government and the CCP.     This practice gives users of the social media platforms the false impression that multiple U.S. persons unaffiliated with the PRC government agree with narratives generated by the PRC government about a variety of topics, and disagree with the publicly held views of PRC dissidents on issues such as the COVID-19 pandemic, the advantages of democracy over autocracy, U.S. domestic and foreign policy, human rights issues in Hong Kong and Xinjiang Province, Taiwan, and the Russian invasion of Ukraine.     By hiding the PRC-government affiliation of the Group's accounts from other users, social media platforms and the U.S. government, Group members seek to influence and manipulate online discourse, including discourse in the United States, toward positions favored by the PRC government and the CCP.

64.     Additionally, Group members and others affiliated with the Group have attempted to recruit U.S. persons to act as unwitting agents of the PRC by disseminating PRC propaganda or narratives.     As a further indication of the coordinated nature of the Group's work in furtherance of the CCP's interests, Group members coordinate with officials

in the United Front Work Department of the Central Committee of the CCP (the "UFWD").[4]

In a June 20, 2020, chat between XI YUE and TAN JINYAN, XI YUE lamented having to

work recently with so many people from the UFWD.    Based on the timing of this

communication, I assess this coordination likely included topics related to the COVID-19

pandemic, the U.S. government's response to developments in Hong Kong, civil unrest in the

United States following the death of George Floyd, and the 2020 presidential election.

       65.    Internal records and communications of the Group reflect that it has

developed and uses various practices and procedures for targeting individuals, including

those residing in the United States, and for propagating PRC official statements through

misattributed accounts.

       66.    New Group members are provided a checklist of items that includes

"Daily management and archives for *guo bao*'s [the First Bureau's] key person(s)" and

"Account of sites for religious practices or cult activities."[5]    The checklist serves as a

starting point for new Group members to familiarize themselves with these norms, practices,

and procedures.    Image 13, which has been redacted to obscure the faces of uncharged

---

[4]     According to an August 2018 report published by the U.S.-China Economic and Security Review Commission, the UFWD coordinates the "United Front" strategy to "co-opt and neutralize sources of potential opposition to the policies and authority" of the CCP.    The report further states the UFWD accomplishes this using a range of methods, including "influenc[ing] overseas Chinese communities, foreign governments, and other actors to take actions or adopt positions supportive of Beijing's preferred policies . . . United Front work serves to promote Beijing's preferred global narrative, pressure individuals living in free and open societies to self-censor and avoid discussing issues unfavorable to the CCP, and harass or undermine groups critical of Beijing's policies."

[5]     Citations to electronic communications include original spellings, punctuation, and grammar. All translations of Chinese language into English are in draft form and are subject to revision.

persons, depicts (from left to right) Group team leaders SONG YANG (I) and XUE WENFENG facing toward the right of the photograph leading a session with other Group members who are facing toward the left of the photograph, including (from left to right) in the first row defendants JU QIANG, YIN YINA and LIN YUQIONG, in the middle row defendant XU ZHEN, and in the back row defendants BAI YUNPENG and MIAO SHIHUI.

**Image 13**



67.     New Group members also receive policy guides and instructional documents, including operational best practices and metrics for evaluating performance. One policy guide contains step-by-step instructions for establishing and maintaining multiple social media accounts on a specific platform.     The instructions contain techniques and tactics for the registration of multiple accounts using temporary email addresses.     After the accounts are registered, Group members are directed to change the profile icons and download translation tools to their browsers, find articles from approved websites, translate the content, post the translated content on the social media accounts, conduct daily checks for replies to the posts, and interact with the users replying to their posts to avoid the appearance of "flooding" the site.     The instructions caution against reposting other users' posts and

indicate other practices that are prohibited and that could result in "points" being deducted from their evaluations or their accounts being blocked.

68.     Other instructions advise the "linking" or use of common email addresses for accounts created on different social media platforms.    These instructions contain tips and video tutorials on tools to help increase the number of followers for each of the accounts, for example the "Mass Follow" plug-in for Twitter accounts.    Still other instructions provide 912 Project officers with assistance on websites they can visit to find "real, ordinary" persons to use in newly registered account profiles.

69.     In accordance with these directives, and using the means and methods outlined below, Group members have created and maintained thousands of social media and other online accounts that, to the public, appear to be used by unique users located around the world, including in the United States.[6]    912 Project officers are instructed to have a minimum number of accounts on various social media platforms, including U.S.-based platforms like Twitter, Facebook and YouTube.    Communications uncovered during the investigation indicate officers often created several accounts on Facebook and Twitter for use in the scheme.    Indeed, to demonstrate that the positions of the PRC government enjoy a broad degree of support across nations, races, ethnicities and genders, the purported users of the social media accounts are based on selected traits and demographics, such as a woman based in Hong Kong, a woman based in Russia, or a person of Hispanic ethnicity based in

---

[6]     For the purposes of this Affidavit, I assess Group social media accounts to include accounts for which subscriber information reflects creation by known Group members, as well as accounts repeatedly discussed in internal Group communications, affiliated with the Group's operational activity, and linked to the Group by forensic evidence.

the United States.   For example, on or about August 31, 2020, one of the Group's Google

accounts ran Internet searches for frequently used characters in female names in Hong Kong.

Similarly, on or about September 6, 2020, BAI YUNPENG created a Facebook account with

the Cyrillic username "Фая Сорокина."   This practice of creating numerous fake accounts

with purportedly diverse subscribers helps Group members to avoid detection by the social

media platform moderators that seek to ensure that active accounts are linked to authentic

users, and the pseudonymous accounts provide the PRC government with a veneer of

deniability for the Group's efforts to harass and threaten dissidents and critics abroad.

        70.   Group members have created numerous social media accounts based in

the United States and designed to appear as though U.S. persons or groups control them.

For example, on or about January 7, 2020, GAO HONGTING created a Facebook account

with the username "Bill Giao."   The homepage for this Facebook account falsely indicates

Bill Giao resides in Palo Alto, California.   Other examples include Facebook accounts

created by Group members on or about November 4, 2017, for "Bethany Pena" and "Leslie

Sherman" purportedly residing in Los Angeles, California and New York, New York

respectively.   On or about December 8, 2017, Group members registered an account with

the username "Susan Miller," who also purportedly lives in New York and studied at New

York University.   Image 14 depicts a screenshot of Susan Miller's profile page.   Until

approximately on or about September 15, 2021, the profile photo for the Susan Miller

Facebook account consisted of a purported selfie photograph as seen in Image 15.

**Image 14**     **Image 15**

   

71.     Some of the Group's Facebook accounts ostensibly belong to users living in locations outside of large coastal metropolitan areas in the United States, in an apparent attempt to show widespread support for the PRC government and the CCP across U.S. socioeconomic and locational demographics.    As examples, on or about August 13, 2016, Group members created a Facebook account for "Julie Torres" of Madison, Wisconsin; on or about August 16, 2016, Group members created a Facebook account for "Stacey Altman" of Sparks, Nevada.    Images 16 and 17 depict screenshots of Julie Torres's profile page and Stacey Altman's profile page, respectively.

**Image 16**      **Image 17**

   

72.      Additionally, Group members create some social media accounts that do not reflect purported locations of residence but display names common among ethnic groups primarily residing in Western countries to suggest that the users are based in the United States or other Western countries.    On or about July 20, 2020, GAO HONGTING created a Twitter account with the display name "Cristina Jones."    Other examples include Group Facebook accounts with usernames "Lacey Sutton," "Sage Huffman," "Charlotte Gray," and "Victoria Rojas," and Twitter accounts I assess based on forensic evidence are affiliated with the Group's operational activities with display names including "Ben K," "Christy Saxton," "Kershaw Anderson," and "Vivian Cheng."    As illustrations of the Group accounts' public-facing appearance, Image 18 depicts a screenshot of the current profile page of Facebook user "Lacey Sutton," and Image 19 depicts the profile of Twitter user "Ben K" and the handle @abeycorp.

**Image 18**                    **Image 19**

    

73. Group members seek to enhance the bona fides of the purported U.S.-based user accounts by having the accounts join Western religious groups, such as the Facebook groups "Jesus Is the Light Of The World," "Bible Daily," "I love GOD & Jesus our Saviour. Join," and "Honest Quotes." Other accounts have joined Facebook groups dedicated to pop culture and/or more mundane topics, such as "Movies FAN" or "Cramps."

74. After creating myriad social media accounts, including accounts of purported U.S. persons, the Group uses certain accounts to post content consistent with CCP narratives that is then quickly amplified through other Group accounts. The themes of Group postings are dictated by taskings based on events of concern to MPS's headquarters and the PRC government, including the Ministry of Foreign Affairs ("MFA").[7] The taskings, accessed by Group members on an encrypted network and encrypted file transfer

---

[7] In addition to taskings specific to the Group, officers also receive taskings as part of broader MPS initiatives, including the 415 Mechanism, which tasks officers with investigating and attempting to suppress those spreading "rumors" online about top CCP leaders and PRC government officials. As shown in Image 27 below, some officers appear to be assigned to work broader MPS initiatives like the 415 Mechanism from within the Group.

systems in what the Group calls its "confidential room," direct the composition of articles and videos based on certain themes highlighted in the taskings.

75.     The Group also receives taskings directly from MPS headquarters that are communicated internally and bypass the use of the encrypted networks in the confidential room.    For example, on or about February 3, 2020, LI BOLUN sent a directive in Chinese to other Group officers in a Group message channel that stated, "@everyone According to the Headquarters' tasking requirement, starting from today, every member of 912 shall write an original article (content: can be related to the pandemic, related to hk [Hong Kong], related to [U.S.-based critic of the CCP, described in greater detail below as Victim-1], all would do), and submit it by 16:00 of that day.[8]    In addition, XU ZHEN [and] YANG MIAO are both responsible for submitting three videos every day, [and] are exempt from articles~~

---

[8]



hereby notified!!"[9]    YANG MIAO subsequently ran searches on how to make YouTube videos automatically generate subtitles and translate them into simplified Chinese.    Notably, a similar directive had gone to 912 Project officers in or about December 2018, as officers were directed to post three videos or posts daily with YouTube and Facebook accounts, with one of the posts required to be "anti-[Victim-1]."

76.    Once content-generating posts are made through the Group accounts, Group and 912 Project officers circulate internal notifications of the postings to alert others of the need to support, like, retweet and share the content through other Group accounts. Group members also utilize chat features within the social media services to initiate and send messages about posted content between the Group-controlled accounts.    For example, on or about January 16, 2021, JU QIANG sent notice in an internal Group chat that a "fb" link had been sent and requested other Group officers carry out their work to amplify the message. JU QIANG's reference to a "fb" link pertains to a post on one of the Facebook accounts he controls.

77.    At times, Group members send notifications of newly posted content in large Group chats of Group-controlled accounts; at other times, the Group-controlled accounts send direct chat messages to other Group-controlled accounts pertaining to the new activity.    For example, on or about September 24, 2020, the "Ben K" Twitter account sent a

---

[9]    The Group message channel included, among others, CHEN ZHICHEN, GAO HONGTING, HU XIAOHUI, HUANG CHUNHUI, JU QIANG, LI BOLUN, LI XUAN, LI XUEYANG, LIANG SHUANG, LIN YUQIONG, LIU ZHAOXI, MIAO SHIHUI, SONG YANG (I), TAN JINYAN, WEN JIANXUN, XI SHUO, XI YUE, XU ZHEN, XUE WENFENG, YANG DALIN, YANG MIAO, YIN YINA and ZHANG DI.

message to another of GAO HONGTING's Twitter accounts (with the username "godlike998") containing a link to a recent post and instructions to "support."

78.     Group members also use certain Twitter accounts with profiles falsely indicating that the user is based in the United States to engage in direct communications with U.S. persons and other foreign nationals.    In these instances, the Group accounts purport to belong to users from places such as New York; Atlanta, Georgia; or Naples, Florida.    For example, in communications to U.S. persons from a Group-affiliated Twitter account created on or about September 17, 2020, with the username "JamesmarkDavid1" and the display name "James mark David," the purported account user claimed in messages that "I [sic] work with the us military," "I AM A SOLDER [sic]," and "I AM PLANING [sic] TO COME TO THAILAND WHEN I FISHED [sic] MY MISSION HERE IN SOMALIA." The account primarily retweets content posted by the U.S. Department of Defense and senior officials, including Secretary of Defense Lloyd Austin.    As detailed below, the account has been used to disseminate content suggesting that a U.S.-based user affiliated with the U.S. military is supportive of the PRC government and its policies.

79.     Group members also use social media accounts to contact individuals assessed to be sympathetic and supportive of the PRC government's narratives, including individuals based in the United States.    Group members ask these assessed sympathizers to use their social media accounts to disseminate Group content.    For example, in direct messages with U.S. persons, the purported user of the James mark David Twitter account introduced himself as "James," "Mark," "David," and "David Mark," and claimed to be living in Atlanta or in New York.    At one point, when the James mark David Twitter

account communicated with an actual user from Georgia, the user of the James mark David

Twitter account claimed to be living in Toronto, but to be originally from Germany.

      80.    The Group provides its members with access to numerous desktop

computers, laptop computers, tablets, mobile phones and other electronic devices to carry out

official operations.   Images 20 and 21 are photographs of some of the Group's

approximately 50 Apple computers and approximately 50 iPhones, respectively.

**Image 20**                   **Image 21**

 

      81.    The Group's devices are labelled with assignment stickers and

"banners" that indicate Unclassified-level use, Secret-level use, or Top Secret-level use.

The banners stipulate the types of information the Group officers may access on such devices

to prevent classified information from spilling into the public domain.   For example, a

Group laptop computer assigned to ZHANG DI bears a green Beijing Municipal Public

Security Bureau computer classification marking to denote security and network statuses of

"Unclassified" and "Internet," respectively, as in Image 22.   Devices intended for use on the

open Internet are often labeled with green banners with the warning that "Internet computers

are strictly prohibited from storing, processing, and transmitting classified and internal

information."   Another Group computer assigned to XUE WENFENG bears a red Beijing

Municipal Public Security Bureau computer classification marking to denote security and network statuses of "Secret" and "Local Network," respectively, as in Image 23.

**Image 22**                                      **Image 23**




82.     Group members use multiple electronic devices concurrently to increase the perception that their social media or online accounts are being accessed by unique and distinct users, thereby minimizing the possibility of being blocked by the social media platforms' moderators.    Image 24 is a photograph of GAO HONGTING simultaneously using three laptop computers.

**Image 24**



83.    Group members also use multiple static Internet Protocol ("IP")
addresses accessed through virtual private networks that are intended to make it more
difficult to attribute control of the Group's online accounts, and thus responsibility for its
activities, to the Group.    These static IP addresses make it easier to access social media and
online accounts from a range of computing systems and mobile devices to conduct activity
that appears to be from U.S.-based and other IP addresses located outside of the PRC.    This
activity includes, but is not limited to, registering new social media accounts, accessing and
maintaining existing social media accounts, and engaging in direct communications with
U.S. persons.    Image 25 is a modified image of a QR code sent to Group officers to access
one of the Group's static IP addresses, used by both GAO HONGTING and XI SHUO.

**Image 25**



84.     Subscriber information associated with Group social media accounts is documented and logged on spreadsheets.    These spreadsheets include information such as email addresses and passwords, the dates of birth of the purported subscribers, IP addresses and/or geographic "zones" associated with the accounts—several of which depict U.S.-based IP addresses and geographic zones, including New York—and the types of Internet browser used.    Image 26 is a modified image of an internal Group spreadsheet listing some of the Group Facebook accounts; the spreadsheet also contains tabs for some of the Group Twitter and YouTube accounts.



85.     The Group tracks the performance of seconded officers on fulfilling their assigned responsibilities.   Seconded officers are awarded points based on, among other things, daily promotions on accounts with Twitter, Facebook, YouTube, Hong Kong Discuss Forum and other sites, and "account maintenance" on Twitter, Facebook and YouTube. "Account maintenance" is an apparent reference to attempts to "normalize" Group accounts with content unrelated to Group taskings and topics that would not otherwise attract attention from the social media sites based on terms-of-service and use agreements.   Image 27, which has been redacted to obscure the names of uncharged persons, depicts a "work point table" dated July 16, 2019, maintained by LI BOLUN to track the monthly point totals accumulated by several Group members including XI SHUO.   As alluded to above, Image 27 indicates some of the seconded officers—including LIANG SHUANG and LIU ZHAOXI—are evaluated based on their assignment from within the Group to work on the 415 Mechanism, a broader MPS initiative targeting online activity critical of senior CCP and PRC government officials, particularly General Secretary Xi Jinping.   Image 27 also shows that in July 2019,

some of the Group's officers were rated highly for their activity on the Group's Twitter and YouTube accounts, others were rated highly for their activity on other Group social media accounts, while others were evaluated favorably on content related to videos.    Internal Group communications reflect frequent discussions on how to cultivate and maintain social media accounts and minimize associated costs as Twitter, Facebook, and other platforms adjusted their terms-of-use policies.

**Image 27**

### 工作积分表（2019年7月26日）

| 序号 | 人员 | 日常推广（次） | | | | | | | | | 工作提成积分 | | | | | | 其他加分 | | 积分说明 | | 当月积分（最后得分） |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 首世辉 | 18 | 13 | 7 | | | 2 | | | | | | | | | | | | | | | 40 |
| 2 | 西明 | 18 | 15 | 7 | | | 2 | | | | | | | | | | | | | | | 43 |
| 3 | 西瑞 | 18 | 11 | 12 | | | 1 | | | | | | | | | | | | | | | 42 |
| 4 | 呼有慧 | 16 | 2 | 1 | | 1 | 3 | | | | | 7 | | | | | | | | | | 30 |
| 5 | 孟建勋 | 17 | | | | 2 | | | | | | 12 | | | | | | | | | | 31 |
| 6 | 孙真 | 18 | | | | | | | 17 | | | | | | | | | | | | | 35 |
| 7 | | 16 | | | 2 | | | | | | | | | | | | | | -1 | 替计闲散 | | 17 |
| 8 | 张然 | 11 | | | | 5 | | | | | | | | | | | | | | | | 16 |
| 9 | | 14 | | | 5 | | | | | | | | | | | | | | -1 | 替计闲散 | | 18 |
| 10 | | 14 | | | 1 | | | | | | | | | | | | | | -1 | 替计闲散 | | 16 |
| 11 | 杨森 | 11 | | | | | | | | | | | | | | | | | | | | 11 |
| | | | | | | | | | 415 | | | | | | | | | | | | | |
| 12 | | 18 | | | | | | | | | | | | | | | | | | | | 18 |
| 13 | 宋斌 | 15 | | | | | | | | | | | | | | | | | | | | 15 |
| 14 | | 18 | | | | | | | | | | | | | | | | | | | | 18 |
| 15 | 刘菊夕 | 15 | | | | | | | | | | | 5 | | | | | | | | | 20 |
| 16 | | 7 | | | | | | | | | | | | | | | | | | | | 7 |
| | | | | | | | | | 内a | | | | | | | | | | | | | |
| 17 | 杨大林 | 18 | | | | | | | | | | | | | | | | | | | | 18 |

## IV.    The Scheme to Harass Dissidents in the United States and Elsewhere

86.    Group members have engaged in a scheme to harass, intimidate and discredit PRC dissidents and critics of the PRC government located throughout the world, including in the United States.    To identify the targets for this harassment scheme, Group members have scrutinized individuals who post online content critical of the PRC government or inconsistent with official PRC narratives.

87.     As part of this scheme, Group members use social media accounts, some of which ostensibly belong to individuals in the United States, to harass PRC dissidents and critics of the PRC government by posting threatening or delegitimizing content regarding such persons.   Group members also take affirmative action to have online meetings and accounts associated with PRC critics or dissidents removed from U.S. social media platforms.

88.     In addition to their campaign of online harassment, Group members identify online users to other PRC law enforcement agents, who can then visit known associates and family members of the PRC dissidents or critics and attempt to dissuade further critical postings through intimidation.   As part of their efforts to identify victims for the harassment scheme, Group members obtain the personal identification information of PRC dissidents or critics, such as their addresses and phone numbers through queries of PRC law enforcement databases.   Image 28 depicts one such query in an MPS database by a Group member (with redactions to remove a target's identifying information) on or about February 1, 2020.

**Image 28**



A.     <u>Harassment of and Threats Against Victim-1 and His/Her Supporters</u>

89.     A primary focus of the Group's harassment scheme is a critic of the CCP who fled the PRC and presently resides in New York City ("Victim-1"). Since at least 2017, Group members have sought to harass Victim-1 through, among other means, anonymized social media accounts operated by the Group and by pressuring U.S. social media companies to remove Victim-1 and U.S.-based associates of Victim-1 from social media platforms. These efforts are part of the PRC government's broader effort to prevent, disrupt and harass Victim-1's use of social media and other online platforms to disseminate and discuss disfavored content. As alluded to above with the February 3, 2020 message sent by LI BOLUN in a Group message channel, Group officers have a standing tasking requirement from MPS headquarters to post content targeting Victim-1. Additional evidence uncovered during the investigation of the broader 912 Project indicates that a standing task requirement to target Victim-1 has existed since on or about December 2018 with officers

instructed to continue to familiarize themselves with background information on the case and related persons and to follow updated overseas content on social media that was both in support of and against Victim-1.

90.    Since Victim-1 fled the PRC, the PRC government has sought his/her return for prosecution in the PRC and has employed numerous methods to effect Victim-1's capture or arrest.    In May 2017, the PRC government sent several undeclared agents from the PRC's Ministry of State Security ("MSS") to the United States to cause Victim-1's coerced repatriation to the PRC as part of the "Fox Hunt" initiative.    However, the U.S. government disrupted the PRC government's efforts to forcefully repatriate Victim-1, and Victim-1 continues to reside in the United States.

91.    Correspondence and photographs uncovered in the investigation depict members working from the Group's Dongcheng District operational location to monitor and disrupt Victim-1's online and social media activity.    For example, Images 29 and 30, redacted to protect Victim-1's identity, depict a Group duty team comprised of HU XIAOHUI, LIU ZHAOXI, MIAO SHIHUI, YANG DALIN and YU MIAO, and led by XI YUE, on or about November 20, 2018, while viewing content pertaining to Victim-1.    The Group's monitoring and disruption of Victim-1's social media and online activity occurred daily, including on weekends and holidays (for example, on February 4, 2019, the eve of Chinese New Year, while a Group team led by XUE WENFENG and including SHI LIANGTIAN and WEN JIANXUN was on duty).

**Image 29**            **Image 30**

 

92.     The Group has also used social media accounts to identify potential supporters of Victim-1 and online activity related to Victim-1.    For example, Group members, including XI SHUO and SHI LIANGTIAN, routinely monitor and engage Victim-1 and his/her supporters on Twitter using accounts not associated with the PRC government. Image 31, redacted to protect Victim-1's identity, depicts a screenshot taken by SHI LIANGTIAN of Twitter activity of a U.S.-based account with content speaking favorably of Victim-1.

**Image 31**



93.     The Group uses social media accounts to target Victim-1 and Victim-1's supporters in a variety of ways.

94.     For example, five Facebook accounts created by BAI YUNPENG, none of which identified their affiliation with the PRC government, targeted Victim-1 from at least July 2018 through June 2019.   On or about January 24, 2018, BAI YUNPENG created a Facebook account with the username "Andy Ouyang" from a Group IP address.   Using the same IP address, BAI YUNPENG created four additional Facebook accounts purporting to belong to "哈利波特大丘吉尔梆硬," "灰化肥会挥发," "Qe二连," and "喵小喵".[10]

95.     During a shift on or about September 11, 2018 led by ZHOU GUOQIANG and with a Group duty team comprised of, among others, BAI YUNPENG, HU

---

[10]     The usernames translate approximately as "Harry Potter and the Great Churchill bang hard," "the ash fertilizer will evaporate," "Qe second company," and "meow little meow."

XIAOHUI, HUANG CHUNHUI, LI BOLUN, YIN YINA and YU MIAO, the Group used

the Andy Ouyang Facebook account to share a video titled in Chinese "Big hemorrhoid

[Victim-1]," in a play on the Chinese character for wisdom.    BAI YUNPENG shared this

video from the Chinese-language YouTube channel "Rumor Shredder: Have love for truths,

not rumors.    This is a rumor shredder, all rumors will be terminated.    [Victim-1] dedicated

column."    The Group used the Andy Ouyang Facebook account to share other videos from

the same YouTube channel targeting Victim-1.

        96.    The Group also used BAI YUNPENG's Facebook accounts for status

updates, which frequently contain content attacking Victim-1, including 120 unique status

updates pertaining to Victim-1.    Those status updates include:

- On or about December 14, 2018, during a duty shift led by LI ZHEFENG that included XU ZHEN: a post in Chinese about one of Victim-1's goals being to discredit the PRC for sensationalism and his/her usual routine of using others to commit crimes and using another person's death to harm more victims.

- On or about January 3, 2019: a post in Chinese about a court decision in the PRC against Victim-1 while threatening that the end of Victim-1 is approaching;

- On or about April 12, 2019: comments in Chinese on some of Victim-1's past appearances on U.S.-based news networks where Victim-1's "tricks" were "exposed" and claiming that Victim-1 "may end up with a tragic ending;"

- On or about May 15, 2019, during a duty shift led by LIN YUQIONG that included XU ZHEN: a post in Chinese about an impoverished Victim-1 kneeling to flatter the U.S. emperor.

- On or about May 28, 2019: a post in Chinese accusing Victim-1 of hiring "democracy activists" to make a fuss and using a U.S. political figure to campaign for Victim-1's political asylum in the United States; and

- On or about June 5, 2019: a post labeling Victim-1 a fugitive who unscrupulously challenges U.S. laws on the Internet and accusing anyone giving Victim-1 money and public support as conspiring with Victim-1.

97. As another example, on or about August 26, 2021, at approximately 2:26:42 AM UTC [Coordinated Universal Time], while a Group team led by CHEN ZHICHEN and including WANG SHIPENG was on duty, a Group Facebook account created on or about May 23, 2018, with the username "Marlon Pindos" uploaded a video about Victim-1 with the caption in Chinese "Full of lies."[11]   Following the post, several of the Group Facebook accounts commented on the video that same day:

- At approximately 2:40:50 AM UTC, one of the Charlotte Gray Facebook accounts commented in Chinese, "Sober up."

- At approximately 2:42:52 AM UTC, the Julie Torres account commented in Chinese, "Do not be fooled again."

- At approximately 2:44:22 AM UTC, the Stacey Altman account commented in Chinese, "Live in a fantasy."

- At approximately 2:45:41 AM UTC, the Leslie Sherman account commented in Chinese, "Everything depends on one mouth."

- At approximately 2:47:36 AM UTC, the Bethany Pena account commented in Chinese, "Do not let the lies from [Victim-1] bewitch you again."

98. On or about September 15, 2021, at approximately 4:03:41 AM UTC, while a Group team led by WANG SHIPENG, and that included LI XUAN, was on duty, the Marlon Pindos Facebook account uploaded a video about Victim-1 with the caption in

---

[11]   The user of the "Marlon Pindos" Facebook account is purportedly based in the Philippines.

Chinese "brags and cheats every day."    Following the post, several of the Group Facebook accounts commented on the video that same day:

- At approximately 4:22:52 AM UTC, the Lacey Sutton account commented in Chinese, "[He/She] is really disgusting."

- At approximately 4:24:26 AM UTC, one of the Charlotte Gray Facebook accounts commented in English, "Yes, [he/she] is a real liar."

- At approximately 4:25:47 AM UTC, the Julie Torres account commented in English, "Why isn't [he/she] in jail? What is the government doing?"

  At approximately 4:30:28 AM UTC, the Stacey Altman account commented in English, "[He/She] go."

- At approximately 4:32:37 AM UTC, the Leslie Sherman account commented in English, "[He/She] is a consummate swindler."

Moreover, the Group used the same device and IP address (which resolves to a Texas-based Internet-service provider ("ISP")) to upload the Victim-1 video with the Marlon Pindos account and to post comments through the Lacey Sutton, Charlotte Gray, Julie Torres, Stacey Altman, and Leslie Sherman accounts.

99.    Indeed, 912 Project officers had received a tasking directing officers to call on U.S. law enforcement to take prompt action against Victim-1.    The Group used the Facebook accounts of multiple purported U.S.-based users to post comments about Marlon Pindos's video about Victim-1, most of which were in English.    The Julie Torres account, purportedly based in Madison, Wisconsin, commented "what is the government doing" in a statement directed at the U.S. government.    Moreover, the initial part of Julie Torres's comment asking, "why isn't [he/she] in jail," questioned why the U.S. authorities had not arrested Victim-1.

100.     On or about September 22, 2021, at approximately 2:06:53 UTC, while a Group team lead by JU QIANG and including GAO CAINAN and YIN YINA was on duty, the Marlon Pindos Facebook account uploaded a video about Victim-1 with a caption in Chinese stating that Victim-1's "scams were exposed."    Following the post, several of the Group's Facebook accounts made the following comments in English on the video that same day:

- At approximately 2:31:22 AM UTC and 2:31:45 AM UTC, the Lacey Sutton account commented, "[He/She] is very hateful" and "[He's/She's] running out of tricks" respectively.

- At approximately 2:32:54 AM UTC, one of the Charlotte Gray Facebook accounts commented, "What's new about [his/her] con."

- At approximately 2:33:54 AM UTC, the Julie Torres account commented, "[He's/She's] really nasty."

- At approximately 2:35:16 AM UTC, the Stacey Altman account commented, "Pity the people [he/she] cheated."

- At approximately 2:36:01 AM UTC, the Leslie Sherman account commented, "You're a big liar," referring to Victim-1.

Moreover, the Group used the same device and the same IP address (which resolves to a Texas-based ISP) to upload the Victim-1 video through the Marlon Pindos account and post responsive comments through the Lacey Sutton, Charlotte Gray, Julie Torres, Stacey Altman, and Leslie Sherman accounts.

101.     On or about September 30, 2021, at approximately 2:21:17 AM UTC, while a Group team lead by JU QIANG and including GAO CAINAN and YIN YINA was on duty, the Group used the Susan Miller Facebook account, with a purported residence in New York, to upload a photo of Victim-1 with the caption in Chinese stating, "in order to get

money by cheating as quickly as possible," along with a comment in Chinese stating, "deceiving by changing tricks." Several other Group accounts of purported U.S.-based users then commented on Susan Miller's photo and about Victim-1 that same day:

- At approximately 2:50:52 AM UTC, the Bethany Pena account commented in Chinese, "cheat for money through various tricks."

  At approximately 2:51:49 AM UTC, the Leslie Sherman account commented in Chinese, "the end of trickster [Victim-1]."

- At approximately 2:52:27 AM UTC, the Stacey Altman account commented in Chinese, "old [Victim-1] will lose everything for sure."

- At approximately 2:53:10 AM UTC, one of the Charlotte Gray Facebook accounts commented in Chinese, "[Victim-1 supporters] wake up."

- At approximately 2:54:28 AM UTC, the Julie Torres account commented in Chinese, "deceive and cheat every day."

102. The Group again posted the comments through the Leslie Sherman, Stacey Altman, Charlotte Gray, Julie Torres, and Lacey Sutton accounts from the same IP address. The Group uploaded the video through the Susan Miller account from this same IP address and commented with the Bethany Pena account from two similar IP addresses. Notably, all three IP addresses resolve to the same Texas-based ISP.

103. Group social media accounts have also been used to attempt to undermine perceptions of Victim-1's reliability. In April and May 2021, Group Facebook accounts repeatedly posted images related to Victim-1 suggesting that Victim-1 was a fugitive from justice. While using the same IP address as the original Facebook posting, other Group Facebook accounts, including those for users "Hiopd Ashf," "Victoria Rojas," "Pippa Allen" and "Наталья Прудникова," searched for the original posts, and then liked

and commented on the attacks on Victim-1. Among the comments were characterizations of Victim-1 as a "big liar." Group duty schedules in April and May 2021 indicate that the Group teams on duty during these attacks were led by GAO CAINAN, JU QIANG, LI XUAN, SONG YANG (I), TAN JINYAN, WANG CHUNJIE, WANG SHIPENG, YANG DALIN and YIN YINA.

104.    The Group utilized a Facebook account created on or about April 28, 2018, by SONG YANG (II) with the display name "Mo Zhang" to attack Victim-1's credibility with at least nine posts in Chinese in November and December 2018. One post, made by the Group on or about December 4, 2018, during a duty shift led by LI ZHEFENG, uses language similar to that from the posts made by the Group using BAI YUNPENG's Facebook account on or about December 14, 2018, during another duty shift led by LI ZHEFENG described above in paragraph 96. The Mo Zhang Facebook posts often tagged Victim-1 and referred to him/her as a "big liar."

105.    The Group utilized multiple accounts on Twitter for similar purposes, including through Twitter accounts created by XU YANAN, HUANG CHUNHUI and ZHANG DI. For example, the Group used a Twitter account created on or about January 9, 2018, by HUANG CHUNHUI with the username "chaos12311" and the display name "Chaos" to "like" a number of other Tweets attempting to discredit Victim-1. One such Tweet in Chinese stated, "I would like to ask all netizens not to be exploited by the media controlled by rumors, gossip, and the rapist, plague ghost [Victim-1]! Plague ghost [Victim-1] is the biggest 'national thief' on the Internet. Spreading rhetoric on the Internet every day, using netizens to satisfy [his/her] own desires, plague ghost [Victim-1]'s crimes are too numerous to mention."

106.    Similarly, Group members used YouTube accounts to post content attacking Victim-1 or to identify persons potentially sympathetic to Victim-1's public statements about the PRC.    In March 2018, the Group used a Google account created by LIU ZHAOXI to search for several videos by or about Victim-1 and "dislike" them.    For example, during a shift on or about March 20, 2018 led by ZHOU GUOQIANG and with a Group duty team including BAI YUNPENG, LI ZHEFENG, LIU ZHAOXI, YIN YINA and ZHANG DI, the Group used a Google account created by LIU ZHAOXI to watch and "dislike" a video from Victim-1 titled in Chinese "How [Victim-1] sees Wang Qishan serving as vice-chairman, will [Victim-1]'s seven points change or not!    Will Himalayas' goal of having rule of law in China still be achieved? [Victim-1]."

107.    On or about April 23, 2018, SONG YANG (I) searched YouTube for Victim-1's name and the phrase "fake documents."    On or about June 6, 2020, both LI XUAN and LIU ZHAOXI searched for a specific video posted on or about June 4, 2020, by Victim-1 and a U.S.-based associate of Victim-1.    On or about June 7, 2020, YANG MIAO ran searches on YouTube for Victim-1's media company and watched a video on recent activity involving Victim-1 and some of Victim-1's U.S.-based supporters.    On or about October 26, 2020, May 11, 2021, June 24, 2021, and October 24, 2021, LIANG SHUANG ran searches on YouTube for Victim-1's name.

108.    On or about April 24, 2018, JU QIANG, while using a U.S.-based email account and using the pseudonym "Amanda J," posted on YouTube a video in Chinese with Chinese and English subtitles titled "Case Briefing on the Forgery of Official Government Documents by [Victim-1], [Victim-1 Associate] and [Victim-1 Associate]".    The video claims that Victim-1 had unveiled a "secret Chinese government document" with

content related to the dispatch of PRC "police officers" and the MSS to the United States on "Field Duty." The video further claims that Victim-1's document was verified by U.S. "government agencies." The video purports to depict Victim-1 revealing a "top secret Chinese government document" issued by the "National Security Commission" of the CCP. Whenever Victim-1 discusses or shows a classified PRC government document in the video, a separate caption appears stating that the document is forged.

B.  Disrupting Videoconferences of U.S.-Based Dissidents

109.  As part of the scheme to harass dissidents, Group members have disrupted efforts by PRC dissidents, including dissidents residing in the United States, to assemble via videoconference and discuss democratic reform in the PRC, among other issues. Since at least in or about 2020, Group members have disrupted meetings by PRC dissidents on a videoconferencing platform hosted by a U.S. Internet services provider headquartered in San Jose, California ("Company-1").

110.  PRC dissidents selected the Company-1 platform because of its accessibility from the PRC, where the dissidents seek to amplify their pro-democracy message. PRC dissidents sometimes used their own social media accounts to publicly advertise and share the meeting details regarding events on Company-1's platform. Other times, PRC dissidents used private communications to organize the meetings.

111.  In both cases, Group members successfully infiltrated and disrupted the events, either by drowning out the speech of the participants with profane and threatening rhetoric or working directly with a co-conspirator employed by Company-1 to cause termination of the meetings because of purported violations of Company-1's terms of service ("TOS"). These approaches helped implement the PRC government's policy of immediate

remediation of any conduct deemed illegal by the PRC government, regardless of whether the users were based in the PRC or outside the PRC (and sometimes in the United States).

a. The May 31, 2020, Commemoration of the 1989 Tiananmen Square Massacre

112.     As indicated above, on or about January 7, 2020, and while a Group team led by LI XUAN and that included GAO HONGTING, LIU ZHAOXI and WEN JIANXUN, was on duty, GAO HONGTING created U.S.-based accounts on Facebook and Twitter with the username "Bill Giao" with purported residence in Palo Alto, California. Soon thereafter, the "Bill Giao" Facebook account began to follow the Facebook account of one of the student leaders of the 1989 Tiananmen Square protests based in the Washington, D.C., area ("Victim-2").     Similarly, the Bill Giao Twitter account began to monitor and receive updates on one of Victim-2's U.S.-based associates.

113.     Victim-2 planned to participate in a videoconference on May 31, 2020, commemorating the Tiananmen Square massacre (the "May 31 Meeting") that was hosted by another former student leader of the 1989 Tiananmen Square protests and who has been an outspoken advocate for human rights and the advance of democracy in the PRC ("Victim-3").     Victim-3, who is based in the United States, used the Company-1 account of a U.S.-based associate ("Victim-4") to host the meeting.     The May 31 Meeting was hosted while both Victim-3 and Victim-4 were in the United States.     Notably, Victim-3 has long been a target monitored by the Group.     For example, on or about August 6, 2018, JU QIANG used one of the Group Facebook accounts to run searches on Victim-3's name.

114.     In the meantime, PRC authorities pressured several potential meeting speakers in the PRC not to attend the May 31 Meeting on the Company-1 platform.     On the morning of May 31, 2020, PRC police officers arrived at the residence in the PRC of a

potential speaker and prevented him/her from using any electronics (and thereby attending the May 31 Meeting). The PRC government similarly pressured another participant who had provided Victim-3 with a pre-recorded video to be played during the May 31 Meeting on the Company-1 platform; this potential speaker was detained by PRC authorities two hours before the May 31 Meeting was scheduled to begin and was held in custody until after June 4, 2020. The potential speaker was released with the warning that he/she would be incarcerated if the video that he/she had provided to Victim-3 was seen by more than 500 viewers.

115. PRC authorities similarly targeted potential speakers for the May 31 Meeting located outside the PRC. For example, one PRC-born speaker who was residing in the United States ("Victim-5") was invited to speak about his/her position that the PRC government had lied to the Chinese people about the Tiananmen Square massacre in denying that it had taken place. However, after initially accepting an invitation to speak at the May 31 Meeting, Victim-5 ceased communicating with Victim-3 until after May 31, 2020. In fact, Victim-5, who was also subject to a campaign of harassment and intimidation by U.S.-based PRC nationals who appear to be operating at the direction of the PRC government, elected to avoid activist initiatives to protect his/her family who remain in the PRC.

116. Further, in an interview with the FBI, Victim-5 indicated that he/she had several calls in late May 2020 with his/her parents, who were horrified after officers with the MPS's First Bureau had visited his/her parents in the PRC and threatened to impose a travel ban on them. Victim-5's father told Victim-5 that he/she would have already been arrested if Victim-5 were in the PRC. Moreover, Victim-5's father told him/her that officers with the MPS's First Bureau were monitoring Victim-5's social media accounts.

Victim-5's spouse in the PRC was also summoned to a meeting with his/her supervisor to discuss Victim-5, reflecting an indication that the spouse's future employment could be jeopardized by Victim-5's actions.

117.    On the day of the May 31 Meeting, from approximately 8:47:23 a.m. through approximately 8:53:32 a.m. Eastern Daylight Time, a Google account created by LI XUAN conducted four searches on YouTube for Victim-3's name in Chinese.    On the same date from approximately 4:47:30 a.m. through 5:00:30 a.m. Eastern Daylight Time, the Google account created by LI XUAN attempted to watch a YouTube video titled "#六四 31 週年网上纪念会 [Victim-3's organization] [Victim-3's name in Chinese] [Victim-3's name in English]" (which translates to "#June 4 31st anniversary online memorial") fourteen times.

118.    Shortly thereafter, at approximately 9:05:16 a.m. Eastern Daylight Time, a Group device assigned to LI XUAN downloaded the Company-1 app.    Other Group devices also downloaded the Company-1 app shortly before the May 31 Meeting.    The FBI's review of Group duty schedules in this time period indicates that at the time of the meeting, LI XUAN led a Group duty team of three Group officers: GAO HONGTING, LIU ZHAOXI and WEN JIANXUN.

119.    During the May 31 Meeting several participants, described by organizers of the meeting as "troublemakers," joined the Company-1 videoconference to disrupt the event by harassing and intimidating the speakers and the pro-democracy attendees.    Some of these "troublemakers" were, in fact, members of the Group.    Among the disruptive participants were attendees with usernames such as "aaa," "a123," "勿忘8964" ("Don't forget 8964," an apparent reference to June 4, 1989—the date of the Tiananmen

Square massacre), as well as "[June 4 Dissident name]希走狗必死" and "民运人士原地阵亡" ("[June 4 Dissident name] running dog must die" and "pro-democracy activists to be killed in action on the spot," respectively).    "Running dog" is a pejorative term used to refer to someone who is a traitor and is sycophantic, unprincipled, and always after his/her own interests, and/or who works for evil.

120.    The "troublemakers" disrupted the meeting through Company-1's chatroom feature, which allows participants in Company-1 video meetings to exchange chat messages.    In these chat messages, the "troublemakers" cursed and scolded pro-democracy participants and praised the massacre of the protesters by the CCP.    For example, user "勿忘8964" commented, "Death to the mothers of all the families of the pro-democracy people! Don't you have some ideas of how many soldiers you had killed, how many guns you had grabbed, and how many tanks you had burned in Tiananmen at the time?"    The user "aaa" added, "After June 4th, the overseas democratic movement has set up a number of organizations, carried out numerous donations.    What have you accomplished?    How much money have you taken?    You have done nothing.    All of you are abroad and enjoying the bread made of human blood shed from the June 4th event!!!    Fake democracy movement, fake!    Fake!    Fake!!"    Similarly, the user "a123" stated, "Finally someone is telling the truth.    Everybody is enjoying the bread made of human blood shed from the June 4th event. It's a little disingenuous."    The user "a123" continued, "The United States follows democracy, but why blame China.    I can't understand you guys.    It's just empty talks."

121.    The harassment persisted throughout the event, with the "troublemakers" targeting some of the invited speakers.    During the presentation of another

speaker ("Victim-6"), the user "a123" commented, "What does a little teenager know? Don't join in to goof around."    As Victim-6 presented in English rather than Chinese, the user "a123" commented, "Speak human, speak Chinese, I don't understand."    Further, during a third speaker's ("Victim-7's") presentation, the user "a123" commented, "Fake westerners are the most annoying one[s]."

122.    Toward the end of the May 31 Meeting, the user "aaa" made another comment in the chatroom suggesting that the meeting was staged, writing "It must be hard to get 200 actors.    How many U.S. dollars can they help you get?    You are eating the bread made of human blood while being complacent.    You are a group of indecent, cowardly, face-distorted, disgusting people."

123.    The usernames associated with the "troublemakers" in the May 31 Meeting joined the meeting from Group static IP addresses using at least four separate Group devices.    As indicated above, the FBI's review of Group duty schedules in this time period indicates that at the time of the meeting, LI XUAN led a Group duty team of three Group officers: GAO HONGTING, LIU ZHAOXI and WEN JIANXUN.    For example, the user "aaa" joined the May 31 Meeting using a Group laptop known to be used by LI XUAN using the Group IP address from Image 25 above; the user "a123" joined the meeting using a Group laptop used by GAO HONGTING from one of the Group's U.S.-based IP addresses. Images 32 and 33 depict modified screenshots of LI XUAN and GAO HONGTING accessing this specific U.S.-based IP address.

**Image 32**          **Image 33**



124.     Victim-3 informed the FBI that the comments (which, as detailed
above, were made by Group members) in the May 31 Meeting were very disruptive and that
they appeared designed to threaten, disrupt and intimidate.     Victim-3 noted that the
comments had a chilling effect for the audience to know that persons—likely from the PRC
government—were watching them and that courage was necessary for participants to join
these events in the first place.     Victim-3 further informed the FBI that comments in the
Company-1 chatroom were all in line with past activities to disrupt his/her events.     From the
perspective of Victim-3, the comments were "textbook" examples of how the PRC
government and its intelligence services operated.

125.     The Group's targeting of the participants and speakers in the May 31
Meeting continued after the event.     Internal Company-1 chats suggest that the MPS's First
Bureau and the MSS sought records and information about the May 31 Meeting from
Xinjiang Jin, also known as "Julien Jin," then a security engineer for Company-1 in

Hangzhou, PRC.[12]    Julien Jin, together with other Company-1 employees in the United

States, collected Victim-4's Company-1 account information, including the account holder

name, the user ID, account ID, account number and meeting history.    Another U.S.-based

employee of Company-1 terminated Victim-4's account and provided Julien Jin with

confirmation of the termination; this communication included Victim-4's true name and

email account.    Company-1 employees in the United States also sent Julien Jin multiple

documents containing the names, associated email accounts and IP addresses used by all

participants in the May 31 Meeting, including users who joined from IP addresses in the

United States.    The investigation has not confirmed whether Julien Jin ultimately relayed

this information to the MPS or the MSS, which had initially sought it from Julien Jin.

Notably, however, GAO HONGTING appears to be among the MPS officers for whom

Julien Jin had stored contact information.

126.    Similarly, following the May 31 Meeting, officers with the MPS's First

Bureau visited the home of Victim-4's family in Sichuan Province in the PRC and placed

Victim-4's father under house arrest.    These officers told Victim-4's father that Victim-4

had engaged in activities that had upset the PRC government—that is, the May 31 Meeting

and comments Victim-4 had posted on his/her Twitter account about the release of a political

prisoner in the PRC—and indicated that Victim-4 should return to the PRC.    Victim-4's

father told Victim-4 that officers with the MPS's First Bureau were monitoring Victim-4's

social media activity.    Indeed, the investigation has obtained intelligence reporting on

---

[12]    Julien Jin's actions to target U.S.-based dissidents are detailed in a criminal complaint filed under Eastern District of New York Docket Number 20-MJ-1103.    Julien Jin remains at large.

Victim-4's activities that was produced and disseminated by 912 Project MPS officers located in Sichuan Province.

127.    PRC agents also targeted the family of Victim-7 the day after the meeting.    During the May 31 Meeting, Victim-7 spoke about a call Victim-7 had received in or about April 2020 from his/her father in the PRC.    During the call, an MPS officer who was with Victim-7's father stated, in sum and substance, that Victim-7 should cease all anti-CCP activities, provide the officer with the passwords to Victim-7's social media accounts, and return to the PRC.    On or about June 1, 2020—the day after the May 31 Meeting—Victim-7's parents received an electronic message from the MPS, which contained a screenshot showing Victim-7 in the May 31 Meeting on Company-1's platform.    I assess that Group members captured this screenshot while infiltrating the meeting to disrupt it. Victim-7's father then sent an electronic message asking whether Victim-7 wanted his/her parents "dead."    Victim-7 was extremely distressed by the pressure exerted by PRC officials on Victim-7 and Victim-7's family, particularly after the May 31 Meeting.

128.    In sum, the participants in the May 31 Meeting have expressed the sentiment that the actions of the "troublemakers" in the meeting, coupled with the coordinated actions of MPS and MSS officers targeting participants' family members, caused severe stress and underscored the ability of the PRC government to undermine the participants' physical safety in the United States.

129.    The Group's targeting of commemorations of the Tiananmen Square massacre continued into 2021.    On or about June 3, 2021, HU XIAOHUI used one of his Facebook accounts to run searches on Facebook for Victim-2's Facebook page and for the name of Victim-3's organization.    On or about June 3, 2021, HU XIAOHUI searched

Facebook for "六四," or "6 4," and a reference to the date of the Tiananmen Square massacre.   On or about June 4, 2021, HU XIAOHUI used the same Facebook account to search Facebook for "六四" and for "8964," another reference to the date of the Tiananmen Square massacre.   HU XIAOHUI also ran searches on Facebook in conjunction with memorial services scheduled at Catholic churches in Hong Kong commemorating the Tiananmen Square massacre.   Based on these searches, I assess that HU XIAOHUI was searching for activity on Facebook related to Victim-2, Victim-3, and others attempting to commemorate the Tiananmen Square massacre.

      b.   The January 21, 2021, Anti-Communism Conference

      130.    On or about January 21, 2021, Victim-2 and a prominent Chinese dissident who participated in the 1989 Tiananmen Square student protests who now resides in the Eastern District of New York ("Victim-8") attempted to organize and host a global Internet conference on anti-communism on Company-1's platform (the "January 21 Meeting").   Pro-democracy activists from the United States, Taiwan and Europe, who included numerous student leaders of the 1989 protests, were scheduled to speak at the conference.   Coordinators intended to highlight human rights issues in the PRC, to warn Americans about the CCP's infiltration in the United States, and to raise these issues as President Joseph Biden's Administration came into office.

      131.    Organizers of the conference used Facebook, Twitter and YouTube accounts to post details about the conference, describing the event as an "anti-communism" event.   Other organizers similarly posted about the upcoming conference on Twitter, Facebook and YouTube.   Though the conference was intended to be open to the public,

Victim-2's posts on Twitter and Facebook directed those interested in participating in the conference to register for the January 21 Meeting by January 20, 2021, by emailing Victim-2 and Victim-8's associate ("Victim-9"), who is based in the Washington, D.C. area.

132.    Victim-9 sent out approximately 300 invitations for the conference, including the meeting details needed to join the event on Company-1's platform.    To avoid disruption by PRC government actors, Victim-9 did not send out invitations to all persons who expressed interest in registration.    Prior to the conference, Victim-9 purchased an account with Company-1 that would accommodate up to 500 participants.    As an additional security measure, Victim-8 and Victim-9 authorized the host of the meeting room on the Company-1 platform to mute all participants except those invited to speak.

133.    Group members were involved in efforts to disrupt the January 21 Meeting.    On or about January 20, 2021, LI XUAN updated the Company-1 app on at least one of his devices with the latest version of Company-1's software.    The FBI's review of Group duty schedules in this time period indicates that at the time of the meeting, LI XUAN led a Group duty team of Group officers LIU ZHAOXI and XU ZHEN.

134.    On the morning of January 21, 2021, Victim-9 opened the Company-1 meeting room for the January 21 Meeting and added Victim-8 as a co-host.    Before the meeting started, Victim-8 began to screen participants in the waiting room of the meeting for individuals potentially interested in disrupting the conference.    However, as the conference was about to begin, Victim-8 decided to admit entry to all participants in the waiting room.

135.    As the conference began, the organizers lost control of the conference after Victim-8, the meeting host, was ejected from the meeting room.    A participant who remained in the Company-1 meeting room for the January 21 Meeting, observed that loud

music began playing and that some of the participants began shouting vulgarities and calling the organizers pejorative terms, including "fraudsters" and "con artists." Additionally, some participants used the Company-1 chat feature to type comments accusing the organizers of being fraudsters and con artists and threatening participants in the conference that they should "drop dead" and "go to hell."

136.    Although Victim-9 provided invitations with meeting details to only 300 persons, the number of participants in the Company-1 meeting reached the 500-person threshold, even as hundreds of other participants remained in the January 21 Meeting waiting room. The Company-1 meeting room was unable to accommodate the number of participants attempting to enter the conference, and the event effectively crashed.

137.    Organizers and hosts of the conference sought multiple times to re-start the January 21 Meeting on Company-1's platform, at times using the Company-1 accounts of different organizers and pro-democracy activists. Another New York-based dissident originally from the PRC ("Victim-10") tried to restart the January 21 Meeting by hosting the event on his/her account. These efforts were disrupted by, among other things, spontaneously shown video clips of pornography, cursing and loud music during the meeting. Some participants also posted comments in the chat feature of Victim-10's meeting room calling the organizers "running dogs," among other insults.

138.    In addition to the disruptions and harassment in the meeting and chatroom on Company-1's platform itself, Victim-10 also received several threatening messages to his/her cell phone, calling Victim-10 a "traitor" or "collaborator," and threatening that Victim-10 would "die miserably." Victim-10 received additional messages

in the days thereafter, that Victim-10 noted were attempts to discredit and smear the reputation of Victim-2.

139.     After multiple unsuccessful attempts to restart the January 21 Meeting, meeting organizers held a smaller event on Company-1's platform, sending the Company-1 meeting details for this smaller event to only the invited speakers and other known pro-democracy sympathizers.

140.     One of the participants in the disrupted the event after Victim-8 received the host-control function was the user "王十一" ("Wang Shiyi").    The user "王十一" joined the January 21 Meeting from the Group IP address from Image 25 above—one of the Group IP addresses used to disrupt the May 31 Meeting by the user "aaa" who used a laptop used by LI XUAN.

141.     Similarly, a participant joined one iteration of the January 21 Meeting on Company-1 with the username "aaa" from what appears to be an unmasked IP address – or a public IP address not hidden by a Virtual Private Network or other privacy tool – resolving to China Telecom, one of the PRC's state-owned telecommunications companies. As noted above, the username "aaa" was also used to disrupt the May 31 Meeting from a Group laptop used by LI XUAN.

142.     The participants in the January 21 Meeting shared with the FBI their feeling of being persecuted even in the United States by the PRC government, as well as a feeling of helplessness in their inability to use the service of a U.S. Internet service provider without fear of retribution from the MPS and MSS.    They noted that the disrupters and PRC agents who intimidated their family members appeared to act in a coordinated manner.

C.    Threats and Harassment Against Victim-11

143.    The Group has also conducted a campaign of harassment and threats against dissidents as part of the Group's broader effort to promote counternarratives pertaining to the scrutiny of human rights issues in Hong Kong, Xinjiang Province, and Taiwan – issues that the CCP has characterized as "internal," and, therefore, not of concern to other countries, including the United States.    Recent events in Hong Kong—including the protests in 2019, the implementation of the National Security Law in 2020, the persecution and arrests of pro-democracy activists, the closure of independent Hong Kong-based media outlets, anti-democratic measures instituted in local elections, and the responses of the U.S. government and other governments to these developments—have been identified as priorities in taskings to the Group.

144.    Group taskings have specifically directed members to focus their efforts on disseminating MFA propaganda regarding democracy in Hong Kong.    For example, one of the taskings from September 26, 2021, instructs that, "in coordination with voice of support from all walks of life, conduct in-depth research and strengthen the guidance of public opinion regarding the list from the Ministry of Foreign Affairs on the evil deeds of the U.S. intervention in Hong Kong."

145.    Another tasking from October 27, 2021, instructs Group members to "strengthen positive publicity and suppress negative public opinion on hot media topics including public groups going to the U.S. Consulate General in Hong Kong and Macau to protest against the U.S. government's harboring of fugitives and undermining the rule of law in Hong Kong and urge the U.S. government to stop interfering in Hong Kong affairs."

146.     The taskings further direct members to "increase positive propaganda" and "suppress negative discussions."    The Group has used its social media accounts— including those associated with purportedly U.S. persons, and none of which identify their affiliation with the PRC government to either U.S. social media companies or their customers—to carry out these taskings.[13]

147.     Consistent with these taskings, the Group began tracking and monitoring social media activity related to leaders of the 2019 Hong Kong protests, including one prominent advocate ("Victim-11") who has recently resided in the United States and regularly travels through the United States.    For example, GAO HONGTING created a Facebook account on or about April 6, 2020, with the username "番茄吴" ("Tomato Wu"), that was subsequently used to search for Facebook activity related to Victim-11.    GAO HONGTING created the Tomato Wu account during a shift led by LI XUAN and with a duty team comprised of himself, LIU ZHAOXI and WEN JIANXUN.

148.     On or about April 9, 2021, and while leading a Group duty team with YANG DALIN, JU QIANG used one of his Group Facebook accounts to post a status update in Chinese stating, "some are alive, [he/she] [Victim-11] is already dead!"    JU QIANG's status update includes a caricature of Victim-11 holding a Molotov cocktail and a suitcase with a caption suggesting that Victim-11 had escaped Hong Kong for the United States in

---

[13]      In addition to disseminating PRC propaganda regarding Hong Kong, the Group has targeted journalists from Hong Kong and Taiwan.    For example, on or about April 2, 2020, in an internal chat that included ZHOU GUOQIANG, XI YUE, LIN YUQIONG and LI XUEYANG, among others, the participants agreed to execute unspecified "countermeasures" against reporters from Hong Kong and Taiwan.

June 2020 prior to the Hong Kong National Security Law going into effect and was still

trying to trick people.    Other Group Facebook accounts commented on JU QIANG's post,

including several accounts of purportedly U.S.-based Facebook users.    Some of the

comments to JU QIANG's post from that same day are as follows:

- At approximately 1:20:08 PM UTC, a Group-controlled account with the username "Mila Wiesner," an account used by JIN YI, commented in Chinese, "some are alive, [he/she] is already dead."

- At approximately 1:31:58 PM UTC, the Julie Torres account commented in Chinese, "repent and be saved."

- At approximately 1:41:12 PM UTC, a Group-controlled account with the username "Alice Rich" commented in Chinese, "law is merciless."

- At approximately 1:43:47 PM UTC, the Lacey Sutton account commented in Chinese, "repent and be saved."

- At approximately 1:50:15 PM UTC, the Stacey Altman account commented in Chinese, "go Hong Kong."

- At approximately 1:52:16 PM UTC, the Bethany Pena account commented in Chinese, "no criminal would go unpunished."

149.    On or about October 13, 2021, HU XIAOHUI used one of his

Facebook accounts to run searches on Facebook for Victim-11's name in English and

Chinese.

150.    During an interview with the FBI, Victim-11 indicated he/she had been

the subject of frequent online and physical harassment, including suffering physical assault

on the streets of Hong Kong and in the Hong Kong International Airport.    Victim-11 had

not experienced similar physical attacks in the United States but was distressed as the online

rhetoric escalated after his/her arrival in the United States.    The volume of online comments

targeting Victim-11, numbering in the thousands, suggested to Victim-11 the involvement of

the PRC government.    The online targeting included comments in English such as, "If I see you, I will cut you into pieces," and "I'm gonna find you and fuck you like a pig!"    Other comments publicized Victim-11's actual physical location, a harassment tactic known as "doxing," which I know from training and experience is a tool of transnational repression. Victim-11 further explained that the PRC government was trying to fit him/her into a false narrative, specifically that Victim-11 is a U.S. agent trained and paid for by the U.S. government.

D. Harassment of Victim-12 and Victim-13, and Narratives on COVID-19

151.    As part of the harassment scheme, the Group has used its social media accounts to disseminate disinformation and PRC government propaganda regarding the COVID-19 pandemic.    The propaganda is generally intended to accomplish one of three things: to shift attention away from Wuhan, PRC, where the coronavirus is believed to have first infected humans; to criticize U.S. government policy designed to combat COVID-19; or to question the safety of COVID-19 vaccines invented in the U.S. and Europe.    In connection with this scheme, the Group has not only helped spread COVID-19 disinformation authored by the MFA through social media accounts that appear to belong to authentic users—including users based in the United States—but also has used similar accounts to target and harass two individuals residing in the United States, including one U.S. citizen.

152.    On or about March 19, 2020, Group leader XI YUE wrote to LI XUEYANG and LIN YUQIONG, among others, stating that "Assistant Minister Chen"— apparently referring to a high-ranking member of the MFA—instructed that it is a "good time to fight back" and that it is "necessary to expose the United States, the United Kingdom, and

other countries' utter disregard for human life and their extreme hypocrisy of protecting human rights"—in "stark contrast" with the PRC's "clear institutional advantages!"   In his message, XI YUE continued that it is "necessary to mobilize the establishment camp, the media, social organizations, legal circles, and others to use a collective voice to comment, to take initiatives, to seize the commanding heights of public opinion, to score points for ourselves, and win public opinion, and to campaign for elections!"

153.   That same day, LI XUEYANG, LIN YUQIONG and XI YUE, among others, wrote to each other in chats about how to spread disinformation about the supposed origins of COVID-19 on Group Twitter and Facebook accounts.   Among the proposals was the statement in Chinese that "The truth came out," alleging that COVID-19 was linked to the U.S. "Biological Weapons Research Base" at Fort Detrick, Maryland and that U.S. athletes participating in the Wuhan Military Games, who stayed near the Huanan seafood market in Wuhan, PRC, might have introduced COVID-19 into Wuhan to "frame" the PRC. The proposed post further stated that the FBI must approve the testing of all COVID-19 patients or else the testing was "illegal," the FBI only approves testing those patients returning from the PRC (and not those without any contact to the PRC), and the purpose of the FBI "controlling" the testing is to "cover up" the U.S. source of COVID-19 and to implement the "secret strategy of framing China for the U.S. source" of the novel coronavirus.   The proposed post ended with a reference to a WHO official stating that "the world should thank" the PRC.   Notably, the substance of this March 19, 2020, internal message was posted verbatim in multiple Group Twitter and Facebook accounts.

154.   As the development and domestic approval of COVID-19 vaccines looked increasingly likely in late 2020—aided by the U.S. government's Operation Warp

Speed—the Group adjusted messaging to target the safety and efficacy of vaccines.    The

Group tweets promoted efforts to "get rid of the virus" by encouraging city-wide lockdowns

akin to the measures imposed on cities in the PRC after confirmed COVID-19 cases.

155.    On or about December 1, 2021, the Group used the

"ppcaCAMjyt5fXwV" Twitter account, an account created on or about September 10, 2021,

by XU YANAN with the display name "公孙阿里", to tweet in Chinese, "For those who

have been used as chess pieces, repent early."    The tweet tagged a Chinese virologist who

fled from the PRC to the United States in 2020 ("Victim-12") and subsequently alleged that

COVID-19 was made in government laboratory in the PRC—seemingly implying that the

virologist is an asset of the U.S. government.

156.    On or about January 20, 2022, the ppcaCAMjyt5fXwV Twitter account

posted a series of tweets about the origins of COVID-19.    Among the ppcaCAMjyt5fXwV

tweets are posts stating, "#COVID19 Why has the previous FBI investigation been

inconclusive?   Because they could not tell others that the COVID-19 actually originated in

their own homes" and "#COVID19 Jack kept saying that the COVID-19 came from Fort

Detrick, and now I have to tell him: you're right!"

157.    The links in the tweets by the ppcaCAMjyt5fXwV Twitter account link

to a video in English titled "The COVID-19 come from Fort Detrick and they've been trying

to cover up the truth."    In sum and substance, the video alleges that the WHO sent a mission

to Wuhan to investigate COVID-19's origins after the United States "accused" Wuhan as

being the origin of the COVID-19.    According to the video, "it was officially confirmed [by

the WHO] that Wuhan was not the original source of the new coronavirus."    The video

claims that "all clues are gradually leading to the biological laboratory at Fort Detrick in the United States," identifies an American athlete ("Victim-13") who participated in the Wuhan Military Games from the U.S. Army as a possible source of the Wuhan epidemic, and alleges that the U.S. military introduced COVID-19 in 2019 to Italy and possibly Japan. The video includes a photograph of Victim-13.

E. Harassment of Victim-14

158. Group accounts have sought to exacerbate social and political tensions in the United States, to retaliate for U.S. regulatory scrutiny of a PRC-based social media company. As part of this campaign, the Group has used U.S.-based accounts purporting to belong to private individuals, including individuals in the United States, to post content seeking to harass a senior executive at a U.S. social media company ("Victim-14") with common antisemitic tropes.

159. For example, on or about December 31, 2021, the ppcqCAMjyt5fXwV Twitter account stated, "Several western media outlets have reported that it was [Victim-14's] lobbying that heightened the concerns about [the PRC-based social media company] in Washington and ultimately prompted the Trump administration to open an investigation into [the PRC-based social media company]."

160. In a separate tweet on or about December 31, 2021, the ppcqCAMjyt5fXwV Twitter account stated, "A business will only work if there are profits to be made. With a Jewish background, [Victim-14] has the shrewdness and cunning of [his/her] Jewish ancestors in his blood."

161.    I assess that the Group is suggesting that any U.S. government investigation into the PRC-based social media company would have been motivated by the personal, political influence of Victim-14.

WHEREFORE, your deponent respectfully requests that arrest warrants issue so that the defendants BAI YUNPENG (白云鹏), CHEN ZHICHEN (陈之琛), GAO CAINAN (高彩楠), GAO HONGTING (高宏亭), HU XIAOHUI (呼啸慧), HUANG CHUNHUI (黄春晖), JIN YI (金乙), JU QIANG (居强), LI BOLUN (李博伦), LI XUAN (李轩), LI XUEYANG (李雪阳), LI ZHEFENG (李哲峰), LIANG SHUANG (梁爽), LIN YUQIONG (林玉琼), also known as "Lin Huishan (林慧姗)," LIU ZHAOXI (刘朝夕), MIAO SHIHUI (苗世辉), SHI LIANGTIAN (史粮田), SONG YANG (I) (宋杨), SONG YANG (II) (宋阳), TAN JINYAN (覃金燕), WANG CHUNJIE (王春杰), WANG SHIPENG (王士朋), WEN JIANXUN (温建勋), XI SHUO (西硕), XI YUE (袭岳), also

known as "Qi Dong (齐栋)," XU YANAN (徐亚楠), XU ZHEN (徐震), XUE WENFENG (薛文峰), also known as "Feng Xu (徐丰)," YANG DALIN (杨大林), YANG MIAO (杨淼), YIN YINA (尹贻娜), YU MIAO (余苗), ZHANG DI (张迪) and ZHOU GUOQIANG (周国强), may be dealt with according to law.

_____
JOSEPH HUGDAHL
Special Agent
Federal Bureau of Investigation


Sworn to me through the transmission of this
Affidavit by reliable telephonic and electronic means
pursuant to Federal Rule of Criminal Procedure 4.1, this
6th day of April, 2023

_____
THE HONORABLE SANKET J. BULSARA
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK